No. 3–07–0915

Filed November 30, 2009

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2009

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court for the 10th Judicial Circuit, Peoria County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07–CF–0915 |
| DAVID ALEXANDER, | ) ) | Honorable Stuart P. Borden, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE CARTER delivered the opinion of the court:

Following a jury trial, the defendant, David Alexander, was convicted of first degree murder for the stabbing death of Sylvester "Mike" Polnitz. 720 ILCS 5/9–1(a)(2) (West 2006). The defendant claimed the stabbing was self-defense. Alternatively, the defendant presented a second-degree-murder theory based upon an unreasonable belief in the justified use of force. The jury rejected both theories and found the defendant guilty of first degree murder. On appeal, the defendant claims: (1) the trial court erred by failing to sua sponte give Illinois Pattern Jury Instructions, Criminal, No. 24-25.09X (4th ed. 2000) (hereinafter IPI Criminal 4th) ; (2) trial counsel was ineffective by failing to request IPI Criminal 4th No. 24-25.09X; and (3) he was denied a fair trial because the trial court did not strictly comply with Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431, eff. May 1, 2007). We affirmed

on May 13, 2009.  On September 30, 2009, the Illinois Supreme Court entered a supervisory order directing this court to vacate its opinion in this matter and reconsider its judgment in light of People v. Glasper, No. 103937 (June 18, 2009), to determine if a different result is warranted. We again affirm.

FACTS

The defendant's trial began on October 1, 2007 with the selection of the jury.  At the beginning of the jury voir dire, the trial court stated:

"I shall now at this time touch upon broad fundamental principles that are applicable to criminal cases.  Do not consider these to be instructions of law. Those will be given to you later at the conclusion of the case.  Now, the indictment that I just read to you or the charge against the defendant is not any evidence or presumption of guilt against the defendant.  It's merely a formal charge necessary to place him on trial.  The defendant is presumed to be innocent of the charge in the indictment.  This presumption remains with him throughout the trial until you've been satisfied by the evidence beyond a reasonable doubt as to the guilt of the defendant, and the burden of proving the guilt of the defendant beyond a reasonable doubt is on the State.  The law does not require the defendant to prove his innocence.  The defendant is not required to present any evidence or testify, and if he chooses not to testify in this case, it cannot be held against him."

At that time, the court did not ask the potential jurors, individually or in a group, whether they understood and accepted these principles.  The defendant did not object or request that the court question the potential jurors on these principles.

2

The court then proceeded to question each potential juror individually. During this questioning, the court asked the first juror the following questions:

"Do you have any bias against a person merely because he has been charged with a criminal offense? *** Will you follow the court's instructions regarding the law regardless of your own personal opinion? *** Will you decide the case without sympathy and prejudice? *** Will you give both the State and the defendant a fair trial? *** Can you wait until the entire case is over and you are actually back in the jury room deliberating before you begin to form your final opinion?"

The court asked substantially the same questions of each subsequent potential juror.

After the jury had been empaneled, the State presented its evidence. Trina Owens testified that she was present at the apartment of the defendant and his girlfriend Kim on the evening of June 22, 2007. When Owens arrived at the apartment, the defendant was not home. Owens and Kim drank an alcoholic beverage and talked for a few hours. Owens testified that she became intoxicated. When the defendant arrived home, he and Kim had a conversation. After that conversation, the defendant asked Owens whether she knew anything about Polnitz shoving and attempting to rape Kim. Owens told him, "No." Owens testified that the defendant seemed calm after this conversation.

Approximately 20 to 30 minutes later, the defendant left the apartment. Owens testified that before the defendant left the apartment, he was in the kitchen and was upset. After the defendant left, Owens looked out the front door to see what the defendant was doing. Owens saw the defendant standing near the front door of Polnitz's apartment. Owens went back inside the apartment to speak to Kim. Owens then went back outside and saw the defendant standing

3

there looking upset. She then went back inside to speak to Kim again, trying to convince her to go and speak to the defendant. Owens then went back out the front door of the apartment onto the front porch. Owens testified that she then saw Polnitz and the defendant toward the back of the building. Owens testified that she felt panicky and went back into the apartment. She then went back outside and saw Polnitz and the defendant running toward an alley. Owens went back in the apartment to convince Kim to speak to the defendant, but Kim did not go outside. Owens went back outside and walked toward the alley. Owens testified that when she reached the alley, she saw Polnitz bleeding and holding his side, and the defendant holding a knife. Owens told the defendant to stop and put down the knife. She then ran to a neighbor's house and asked someone to call 911. Owens then returned to the alley and saw the defendant, Polnitz, and a woman. Polnitz was on the ground and bleeding. Owens testified that she saw a lot of blood. Owens told them that she had called for help, and the defendant left soon thereafter.

Officer Brad Venzon testified that he was dispatched to an alley shortly after midnight on June 23, 2007. Venzon was the first responder to the scene. Venzon observed a woman kneeling over a man who was lying on his back in the alley. The man's left leg was covered in blood and there was a large amount of blood on the ground under his leg. Venzon approached the people in the alley. The man was barely conscious, and he was gasping for air. The woman told the officer that the man's name was Sylvester Polnitz and that he had been stabbed in the leg. The woman also told Venzon the name of the person who had stabbed Polnitz. Venzon applied pressure to Polnitz's leg in an attempt to stem the bleeding. A few minutes later, emergency medical personnel arrived. After securing the alley, Venzon walked back toward the apartment building. Venzon did not find any weapons or see any blood on the ground on the way.

4

Captain Tom Carr of the Peoria fire department testified that he responded to a report of a stabbing in an alley shortly after midnight on June 23, 2007. Carr arrived at the alley approximately two to three minutes after the initial report. Upon arrival, Carr observed Polnitz lying on the ground and bleeding heavily from a wound to his lower leg. Carr testified that Polnitz was also in respiratory distress when he arrived at the scene. Paramedics arrived approximately two to three minutes after Carr. Polnitz went into full arrest while still in the alley. The emergency medical personnel, including Carr, transported Polnitz to Saint Francis hospital while attempting cardiopulmonary resuscitation.

Officer Roberto Vasquez of the Peoria police department testified that he was assigned to follow the ambulance and stay with Polnitz at the hospital on June 23, 2007. Vasquez was present when Polnitz was pronounced dead at approximately 12:53 a.m.

Emily Foster testified that she lived in an apartment with her children, her aunt and Polnitz, who was her aunt's boyfriend. There were three apartments in the building– two apartments on the ground floor, and one upstairs. Emily lived in one of the ground-floor apartments, and the defendant lived in the other.

On Friday night, June 22, 2007, Emily and Polnitz walked from their apartment to a gas station to buy cigarettes. Emily testified that it was raining that night. When they returned home, they entered the back porch to go into their apartment. As they entered the porch, Emily heard someone banging on the front door. Emily stayed on the back porch while Polnitz walked around the building toward the front door. Emily then heard Polnitz yelling. Emily stepped off the back porch and saw Polnitz running toward the alley with the defendant following him. Emily testified that she did not see any blood on Polnitz at that time, nor was Polnitz limping.

5

Emily ran after them into the alley. When Emily arrived at the alley, she saw Polnitz on his hands and knees crawling away from the defendant. Emily testified that she then saw the defendant stab Polnitz in his lower left leg. Emily yelled at the defendant, who turned and began yelling back at her. Polnitz told the defendant to leave her alone. The defendant turned back toward Polnitz and then ran back toward the apartment building. Emily ran to Polnitz. Polnitz stood up, walked a few feet and told her to call 911 before lying back down. Emily then called 911.

Detective Mark Lamb testified that he arrived at the scene of the stabbing at approximately 1 a.m. Lamb observed a large pool of blood in the alley. Lamb walked from the alley to the apartment building. He testified that he did not find a blood trail between the alley and the building. Lamb testified that a porch runs along the front of the building onto which the front doors of the apartments open. There were two small tables and two chairs on the front porch of the building near the front door of the defendant's apartment. Lamb did not see any tables near the front door of Polnitz's apartment. Lamb also testified that there was a rug on the porch and that there were numerous stains on the rug.

Officer Scott Bowers arrived to investigate the scene of the stabbing at approximately 2:15 a.m. on June 23, 2007. Bowers testified that it was raining that morning. Bowers searched the alley and the area between the alley and the apartment building. Bowers did not find a weapon or any signs of blood outside of the alley. He also did not find a weapon or any blood on the front porch of the building.

Dr. Violette Hnilica, a forensic pathologist, testified that she performed an autopsy on Polnitz on June 23, 2007. Hnilica testified that the cause of Polnitz's death was multiple stab

6

wounds. Polnitz had multiple minor abrasions on the left side of his body. Polnitz also had three separate stab wounds; he had been stabbed once in the abdomen and twice in his lower left leg. One of the wounds in Polnitz's leg totally severed an artery and vein. Hnilica testified that this wound was the most rapidly fatal because it caused massive bleeding as blood was pushed out of the artery with every beat of Polnitz's heart. The other stab wound to the leg did not go as far into the leg and did not bleed as forcefully. Polnitz was also stabbed in his abdomen. That wound was three inches deep, but went into fat in the abdomen and did not cause serious damage.

In his defense, the defendant presented the testimony of Edward Barry. Barry testified that he has lived in the same neighborhood as the defendant since the defendant was born. Barry also testified that the defendant has a reputation as a peaceful and nonviolent person.

The defendant testified that he arrived home at approximately 10 or 10:30 p.m. on June 22, 2007. The defendant's girlfriend, Kim, was crying and appeared upset. Kim eventually told the defendant that earlier that day Polnitz had knocked on the door of their apartment and then pushed the door in and attempted to sexually assault her. The defendant testified that Kim told him this information in pieces and was evasive. The defendant decided to go next door and speak to Polnitz. The defendant testified that he went outside onto the porch and then knocked on the front door of Polnitz's apartment. Polnitz's girlfriend told the defendant that Polnitz was not home, so the defendant went back into his apartment.

Approximately 30 to 45 minutes later, the defendant knocked on Polnitz's front door again. The defendant testified that he did not have anything in his hands at this time and that it was raining. The defendant knocked on Polnitz's door, which was not on the covered porch, and

7

then stepped back onto the porch to get out of the rain. Polnitz then came around the outside of the house from the rear and walked onto the covered porch. The defendant testified that he greeted Polnitz and then asked him what happened between Polnitz and Kim. Polnitz became angry and began yelling at the defendant. The defendant turned to go back into his apartment. Polnitz said, "You ain't nothing but a little punk anyway," and hit the defendant on the back of his head. The defendant fell, and his hand hit a small table on the porch as he tried to catch himself. The defendant testified that there was a tire jack and a knife on the table. The defendant picked up the knife and turned toward Polnitz. As Polnitz advanced toward him, the defendant stabbed him in the abdomen. The defendant testified that he stabbed Polnitz because Polnitz was yelling at him and continuing to come toward him. The defendant thought that Polnitz was going to hit him again. After the defendant stabbed Polnitz, Polnitz continued to advance toward him, so the defendant stabbed him twice in the leg. The defendant was still on the floor of the porch when he stabbed Polnitz, who was standing over him. The defendant testified that he could not escape from Polnitz because there was a porch railing on one side of him and the wall of the building on the other.

After the defendant stabbed Polnitz the third time, Polnitz ran toward the alley. The defendant testified that he then threw down the knife and followed Polnitz. When the defendant was approximately 15 feet away from Polnitz, he saw Polnitz trip and fall in the middle of the alley. At that point, Emily walked up behind the defendant and asked him what he was doing. The defendant told her "nothing" and walked back toward his apartment. At that time, the defendant did not think that he had badly hurt Polnitz. The defendant testified that he did not go back inside the apartment because he did not want Polnitz to "mess with" Kim or her daughter.

8

Instead, the defendant got on a bus and eventually went to his sister's house. The defendant further testified that when he learned that Polnitz had died from the stab wounds, he turned himself in to the police.

In rebuttal, the State presented additional testimony from Detective Lamb. Lamb testified that he interviewed the defendant on June 24, 2007, which was video-recorded. The State played three small sections of the interview for the jury, totaling 10 seconds in duration.

The jury was also presented with evidence regarding the previous criminal convictions of both Polnitz and the defendant. Polnitz had been convicted of domestic battery in 2001 and disorderly conduct in 2003. The defendant was convicted twice of misdemeanor theft in 2003.

During the jury instruction conference, the State requested IPI Criminal 4th No. 24-25.09, and the defendant objected. This instruction provides:

"A person who initially provokes the use of force against himself is justified in the use of force only if

the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person." IPI Criminal 4th No. 24-25.09.

The court ruled that sufficient evidence had been introduced to suggest that the defendant had initially provoked the use of force and allowed the instruction. Neither party requested IPI Criminal 4th No. 24-25.09X, which states, "A person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the

9

aggressor."

The jury found the defendant guilty of first degree murder, and the defendant was sentenced to 35 years' imprisonment. The defendant appeals.

ANALYSIS

First, the defendant contends that trial court erred by failing to sua sponte give IPI Criminal 4th No. 24-25.09X, regarding a defendant's use of force when the defendant was not the initial aggressor. The defendant claims that the jury's determination of whether he was the initial aggressor was an essential element of the State's duty to prove beyond a reasonable doubt that the defendant was not justified in the use of force. The defendant further maintains that the trial court effectively instructed the jury that the defendant was in fact the initial aggressor by instructing them under IPI Criminal 4th No. 24-25.09, when a defendant is the initial aggressor, but by failing to sua sponte instruct it under IPI Criminal 4th No. 24-25.09X, when a defendant is not the initial aggressor. The defendant acknowledges that he did not request this instruction below, but claims the issue should be considered as plain error under Supreme Court Rule 451(c) (210 Ill. 2d R.451(c)) because the failure to instruct the jury of IPI Criminal 4th No. 24-25.09X threatened the fundamental fairness of the trial. The State disagrees, arguing that the trial court's failure to give IPI Criminal 4th No. 24-25.09X did not constitute plain error under Rule 451(c). The State contends that a determination of who was the initial aggressor in this case was not an essential element of the charged offense nor of the defendant's self-defense claim.

It is the parties' responsibility to prepare jury instructions and tender those instructions to the trial court. People v. Underwood, 72 Ill. 2d 124, 129, 378 N.E.2d 513, 515 (1978). "Generally, the trial court is under no obligation either to give jury instructions not requested by

10

counsel or to rewrite instructions tendered by counsel." Underwood, 72 Ill. 2d at 129, 378 N.E.2d at 515. In addition, a party may not raise on appeal the failure to give a jury instruction unless that party tendered the instruction. 155 Ill. 2d R. 366(b)(2)(i). However, substantial defects in jury instructions are not waived for failure to make a timely objection if the interests of justice require. 210 Ill. 2d R. 451(c). "Rule 451(c)'s exception to the waiver rule for substantial defects applies when there is a grave error or when the case is so factually close that fundamental fairness requires that the jury be properly instructed." People v. Hopp, 209 Ill. 2d 1, 7, 805 N.E.2d 1190, 1194 (2004). "[T]he erroneous omission of a jury instruction rises to the level of plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." Hopp, 209 Ill. 2d at 8, 805 N.E.2d at 1194.

To support his claim that the court erred by failing to give IPI Criminal 4th No. 24-25.09X, the defendant relies upon the committee note to the instruction. That committee note states that in appropriate circumstances both IPI Criminal 4th No. 24-25.09 and IPI Criminal 4th No. 24-25.09X should be given. IPI Criminal 4th No. 24-25.09X, Committee Note.

In People v. Hopp, the Illinois Supreme Court found that the court erred when it failed to give a pattern jury instruction defining first degree murder where the defendant was charged with conspiracy to commit first degree murder. Hopp, 209 Ill. 2d at 7, 805 N.E.2d at 1194. In that case, the jury was instructed under IPI Criminal 4th No. 6.03 of the elements of the crime of conspiracy. Hopp, 209 Ill. 2d at 7, 805 N.E.2d at 1194. The committee note to that instruction states that the court must also give an instruction defining the offense that is the alleged subject of the conspiracy. Hopp, 209 Ill. 2d at 7, 805 N.E.2d at 1194. In that case, the court found that it

11

was mandatory that the trial court give an instruction defining first degree murder. Hopp, 209 Ill. 2d at 7, 805 N.E.2d at 1194. However, the court ultimately concluded that the court's error did not rise to the level of plain error because the evidence was overwhelming and the error did not severely threaten the fairness of the defendant's trial. Hopp, 209 Ill. 2d at 18-19, 805 N.E.2d at 1200.

In this case, the committee note to IPI Criminal 4th No. 24-25.09X does not mandate that it be given whenever IPI Criminal 4th No. 24.25.09 is given. Rather, the note states that both instructions should be given in appropriate cases. The decision as to whether both instructions are appropriate given the specific alleged facts of a case is left to the trial court's discretion. See People v. Sims, 374 Ill. App. 3d 427, 431, 871 N.E.2d 153, 156-57 (2007). Under the circumstances of this case, we find no abuse of discretion in the court's failure to sua sponte give the jury instruction at issue.

However, even if we were to find that the trial court abused its discretion by failing to sua sponte give IPI Criminal 4th No. 24-25.09X, any error did not threaten the fundamental fairness of the trial. The defendant argues that he was denied a fair trial because the jury instructions directed the jury's finding as to an essential element of the case. However, a determination of whether the defendant initially provoked the use of force was not an essential element of the charged crime or his claim of self-defense. The jury was instructed on the elements and burdens of proof of first degree murder, second degree murder, and self-defense. Under the evidence presented in this case, the defendant's claim of self-defense hinged on the reasonableness of the defendant's use of force, not on whether he had a duty to escape before inflicting that force. Regardless of whether the jury believed that the defendant was the initial aggressor and provoked

12

Polnitz into hitting him on the back of the head, the defendant testified that he responded by stabbing Polnitz three times. The critical question of the defendant's self-defense claim was whether his use of that force was reasonable in these circumstances. Thus, the trial court's failure to sua sponte instruct the jury of IPI Criminal 4th No. 24-25.09X did not direct the jury's finding as to an essential element in this case and did not create a risk that the jury misunderstood the applicable law.

Furthermore, we disagree with the defendant's proposition that instructing the jury on an issue, but not as to the opposite scenario, directed the jury's finding on that issue or "ascribed [a] label to the defendant." The jury was not stripped of its role as fact finder by the failure to give both IPI Criminal 4th No. 24-25.09 and IPI Criminal 4th No. 24-25.09X. Looking at the jury instructions as a whole, the jury was clearly instructed of its duty to be the final arbiter of the facts, including the determination of whether the defendant was the initial aggressor. The jury in this instance was not misinformed of the applicable law, and was not stripped of its role as finder of fact. Thus, the defendant's forfeiture of this issue cannot be excused under Rule 451(c).

Alternatively, the defendant contends that trial counsel was ineffective by failing to request IPI Criminal 4th No. 24-25.09X. To sustain a claim of ineffective assistance of counsel, a defendant must prove that defense counsel's performance fell below an objective standard of reasonableness, and that this performance actually prejudiced the defendant. People v. Johnson, 218 Ill. 2d 125, 143, 842 N.E.2d 714, 725 (2005). To prove prejudice, the defendant must show that but for counsel's deficient performance, there was a reasonable probability that the trial result would have been different. Johnson, 218 Ill. 2d at 143-44, 842 N.E.2d at 725.

In this case, the defendant has not shown that he would have been found not guilty or that

13

the jury would have found him guilty of the lesser offense of second degree murder if counsel had requested the subject jury instruction. As previously discussed, the question of whether the defendant was the initial aggressor was presented to the jury. Furthermore, a determination of this issue does not affect the jury's apparent conclusion that the defendant did not believe, reasonably or unreasonably, that his use of force was necessary to prevent imminent death or great bodily harm to himself. Thus, we find that defendant's claim of ineffective assistance of counsel fails.

Finally, the defendant claims that he was denied his right to a trial by an impartial jury because the jury voir dire was inadequate. The defendant maintains that the trial court's failure to strictly comply with Supreme Court Rule 431(b) was plain error and requires reversal of his conviction. Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431, eff. May 1, 2007. The State contends that the court's error was harmless.

Supreme Court Rule 431(b) was passed to ensure compliance with the supreme court's decision in People v. Zehr, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984). Zehr held that it was reversible error where the trial court refused to ask questions proffered by the defendant concerning the presumption of innocence and the State's burden to prove the defendant guilty beyond a reasonable doubt, and the subject matter of those questions was not otherwise included during voir dire. Zehr, 103 Ill. 2d at 476-78, 469 N.E.2d at 1063-64. Initially, the rule provided that the court shall ask potential jurors whether they understand and accept certain principles if the defendant requests that the court do so. The rule was amended in 2007, deleting the phrase "If requested by the defendant," from the beginning of the paragraph. Effective May 1, 2007, Rule 431(b) provides:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431, eff. May 1, 2007. We review de novo issues concerning the application of a supreme court rule. People v. Reed, 376 Ill. App. 3d 121, 125, 875 N.E.2d 167, 171 (2007).

Here, the trial court informed the potential jurors during voir dire of the principles set forth in Rule 431(b), but did not specifically ask them if they understood and accepted these principles. However, the defendant did not object, request that the court ask the jurors whether they accepted the principles, or raise the issue in a posttrial motion and, thus, forfeited the issue for review. People v. Allen, 222 Ill. 2d 340, 350, 856 N.E.2d 349, 351 (2006). Therefore, we must determine whether the defendant's forfeiture of the issue may be excused under the plain error rule. 134 Ill. 2d R. 615(a).

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a). "The plain-error doctrine

15

does not instruct a reviewing court to consider all forfeited errors." People v. Herron, 215 Ill. 2d 167, 177, 830 N.E.2d 467, 474 (2005). A reviewing court will reach a forfeited error affecting substantial rights in two circumstances. Herron, 215 Ill. 2d at 178, 830 N.E.2d at 475. First, the court may consider a forfeited error "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence." Herron, 215 Ill. 2d at 178, 830 N.E.2d at 475. Second, a reviewing court may consider a forfeited error "where the error is so serious that the defendant was denied a substantial right, and thus a fair trial." Herron, 215 Ill. 2d at 179, 830 N.E.2d at 475.

The first step in any plain-error analysis is to determine whether clear or obvious error occurred. People v. Piatkowski, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-411 (2007). "'The supreme court rules are not merely suggestions to be complied with if convenient but rather obligations which the parties and the courts are required to follow.'" Reed, 376 Ill. App. 3d at 125, 875 N.E.2d at 171, quoting Medow v. Flavin, 336 Ill. App. 3d 20, 36, 782 N.E.2d 733, 746-47 (2002). In this case, the court admonished the jury venire of the Rule 431(b) principles, but did not specifically ask the potential jurors, either individually or in a group, whether they understood and accepted these principles, as required by the rule. Thus, the trial court erred.

The defendant does not argue that the evidence was closely balanced. Thus, we limit our plain error analysis to the second prong of the Herron test. Herron, 215 Ill. 2d at 179, 830 N.E.2d at 475. The defendant maintains that the court's error was so fundamental and of such magnitude that he was denied a fair trial. The defendant has the burden of persuading this court that the court's error severely threatened the fairness of his trial. Herron, 215 Ill. 2d at 187, 830 N.E.2d at 480, citing Hopp, 209 Ill. 2d at 12, 805 N.E.2d at 1197.

16

In Glasper, No. 103937 (June 18, 2009), the Illinois Supreme Court considered whether the trial court's failure to comply with the then-applicable version of Rule 431(b)(4) required automatic reversal or whether the error was amenable to harmless error review. The defendant in that case argued that the court's failure to ask the requested question under Rule 431(b)(4) deprived him of his constitutional right to a fair trial before an impartial jury. Glasper, No. 103937, slip op. at 10. The Glasper court ruled that the trial court's failure to comply with the previous version of Rule 431(b)(4) was not a structural error and, thus, automatic reversal was not required. Glasper, No. 103937, slip op. at 18. A structural error is a systemic error that erodes the integrity of the judicial process and undermines the fairness of the proceedings. Glasper, No. 103937, slip op. at 16. When defining "structural errror," the Glasper court quoted language in Herron that describes the substantial rights prong of the plain error test. Glasper, No. 103937, slip op. at 16. Thus, we conclude that the discussion in Glasper regarding structural error is applicable to our consideration of the second prong of the Herron test.

In reaching its conclusion that the error at issue in Glasper was not automatically reversible error, the court stated that the failure to ask a jury venire whether they understood and accepted that the defendant's failure to testify cannot be held against him "does not involve a fundamental right, or even a constitutional protection." Glasper, No. 103937, slip op. at 12. Rejecting the defendant's argument that his constitutional rights were violated by the court's error, the court acknowledged that Rule 431(b) was "designed to help ensure that defendants are tried before a fair jury," however "we cannot say that Rule 431(b)(4) questioning is indispensable to a fair trial." Glasper, No. 103937, slip op. at 16. Rather, the error in Glasper and the instant case "involves a right made available only by rule" of the Illinois Supreme Court. Glasper, No.

17

103937, slip op. at 12. Further, the court stated, "[t]he violation of a supreme court rule does not mandate reversal in every case." Glasper, No. 103937, slip op. at 13. The Glasper court also recognized that it was free to determine whether, as a matter of state law, the failure to question the venire in accordance with Rule 431(b) was an error so severe that reversal was required, regardless of whether the error was structural under federal law. Glasper, No. 103937, slip op. at 18. The court declined to do so. Glasper, No. 103937, slip op. at 18.

We acknowledge that Glasper considered the previous version of Rule 431(b), which is not at issue here. The only difference between the older version of the rule and the current version is that the court is now required in all cases to ask prospective jurors of their understanding and acceptance of the listed principles, regardless of whether a defendant requests any such questioning. We do not think that this difference precludes application of the Glasper rationale to the instant case.

The Glasper opinion also noted that in People v. Emerson, 122 Ill. 2d 411, 522 N.E.2d 1109 (1987), the supreme court "moved away from the portion of the Zehr holding which stated that the relevant questions should be covered 'in the course of interrogation on voir dire,' and that the failure to ask these questions amounts to 'prejudicial error.' " Glasper, No. 103937, slip op. at 16, quoting People v. Zehr, 103 Ill. 2d 472, 477-78, 469 N.E.2d 1062, 1064 (1984). In Emerson, the supreme court considered whether the trial court erred by refusing to ask prospective jurors whether they understood that an accused is presumed to be innocent and whether they had any objection to that principle. Emerson, 122 Ill. 2d at 425-27, 522 N.E.2d at 1114-15. The trial court declined the defendant's request to ask those questions because the court believed it had sufficiently covered those principles in other remarks. Emerson, 122 Ill. 2d

18

at 425, 522 N.E.2d at 1114. The trial court had instructed the prospective jurors on the Zehr principles and asked the jury panel whether they could follow the law as instructed by the court. Emerson, 122 Ill. 2d at 426, 522 N.E.2d at 1114. The supreme court concluded that the trial court's instructions coupled with this question satisfied Zehr. Emerson, 122 Ill. 2d at 427, 522 N.E.2d at 1115.

In this case, at the beginning of the voir dire, the trial court informed the jury pool of the four principles set forth in Rule 431(b). Additionally, the court questioned the potential jurors regarding the first of these principles, albeit in a slightly different form, when it asked "Do you have any bias against a person merely because he has been charged with a criminal offense?" The court also asked the jurors a series of questions regarding their ability to follow the court's instructions, decide the case fairly and without prejudice, and wait until the conclusion of all evidence to formulate an opinion. In light of these circumstances, we do not believe that the trial court's failure to strictly comply with Rule 431(b) denied the defendant an impartial jury and, thus, a fair trial. See Glasper, No. 103937 (June 18, 2009); see also Emerson, 122 Ill. 2d at 426-27, 522 N.E.2d at 1114-15.

The defendant also argues that the court undermined the importance of the Rule 431(b) principles when it stated that these principles were fundamental principles, but not instructions of law, which the jury would receive at the end of the case. The court's comments seem to be taken from the language of Rule 431. Rule 431(b) calls the relevant principles "principles." In addition Rule 431(a) directs the court to "acquaint prospective jurors with the general duties and responsibilities of jurors," and cautions the court not to question jurors on matters of law or instructions. Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(a), eff. May 1,

19

2007. We decline to find that the court's decision to use language from Rule 431 caused the jurors to believe that they need not concern themselves with the principles stated by the court.

CONCLUSION

Based upon the above analysis, we find that the trial court's failure to <u>sua</u> <u>sponte</u> instruct the jury under IPI Criminal 4th No. 24-25.09X was not plain error. In addition, trial counsel was not ineffective for failing to request that instruction. Finally, although the trial court erred by failing to question the prospective jurors about their acceptance of the principles set out in Rule 431(b), that failure did not render the defendant's trial fundamentally unfair. Accordingly, the judgment of the Peoria County circuit court is affirmed.

Affirmed.

SCHMIDT, J. concurring.

JUSTICE McDADE, concurring in part, dissenting in part:

I concur in that portion of the majority's decision finding that: (1) the trial court's failure to instruct the jury, *sua sponte*, of I.P.I. Criminal 4th No. 24-25.09X was not plain error, and (2) defendant's claim of ineffective assistance of trial counsel fails on its merits. I dissent, however, from the finding that the trial court's failure to comply with Supreme Court Rule 431(b) (Rule 431(b)) (Official Reports Advance Sheet No. 8 (April 11, 2007) R. 431(b), eff. May 1, 2007) does not entitle defendant to a new trial.

I begin my analysis --which is as much policy, philosophy and precedent as legal context-- with the premise that the supreme court rules play a significant role in the fair operation of our judicial system and, therefore, that the court does not either make or change its rules for no reason or with no intended impact.

20

We employ an adversarial process in our courts. That process relies on the philosophy that if the parties bring their dispute before an impartial fact finder, and evidence is presented and tested through direct- and cross-examination, and the applicable law is applied, the truth will be revealed. Through the education of prospective lawyers, the promulgation of rules of professional conduct, the maintenance of a registration and disciplinary system for members of the bar, the requirement of free legal assistance for indigent criminal defendants, and even the requirement that attorneys either provide *pro bono* service hours or make monetary contributions to not-for-profit agencies providing free legal services in civil cases, the supreme court strives to maintain a basic level of competence and reasonable professional performance among lawyers and judges in the state. But lawyers and judges are human, and there will undoubtedly be variations in knowledge, skill, available time, and work ethic that will not infrequently skew the truth-seeking function of the courts.

It is, I believe, the quest for a level playing field which best serves the proper functioning of the adversarial process that has caused the supreme court to adopt rules relating to the procedures to be followed in the courts of Illinois. I believe, subject, of course, to correction from the supreme court, that that purpose is the reason why the court so often reiterates that its rules are mandatory and not merely aspirational. *People v. Henderson*, 217 Ill. 2d 449, 471, 841 N.E.2d 872, 884 (2005) ("Such a conclusion is further supported by this court's familiar maxim that '[t]he rules of court we have promulgated are not aspirational. They are not suggestions. They have the force of law, and the presumption must be that they will be obeyed and enforced as written.' *Bright v. Dicke,* 166 Ill. 2d 204, 210, 652 N.E.2d 275 (1995)). Thus, strict compliance with the rules of this court is generally required. *Village of Lake Villa v. Stokovich,*

211 Ill. 2d 106, 116, 810 N.E.2d 13 (2004)").

It would seem to me that *if* I am correct that the rules are integral to our system of justice, there should be a corresponding presumption that, absent clear evidence to the contrary, the violation of a rule results in some level of prejudice to the party who has lost its benefit. Although such a presumption would be rebuttable, it should reasonably be the burden of the violator to prove the violation was not harmful, not of the victim to prove that it was. But see, *People v. Herron,* 215 Ill. 2d 167, 187, 830 N.E.2d 467, 480 (2005) (The defendant has the burden of persuading this court that the court's error severely threatened the fairness of his trial.)

It has also been my observation that rules are added because of unmet systemic needs, and are amended as a result of flaws in either their execution or enforcement. It is within this general context that I consider whether the 2007 amendment to supreme court Rule 431(b) compels a different decision than that reached when the supreme court considered the 1997 amendment to that rule in *People v. Glasper,* No. 1039937, 2009 Ill LEXIS 933 (June 18, 2009).

I have to admit that the *Glasper* decision itself causes me pause because it appears to so easily support the majority's reasoning. Nonetheless, there is language in *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984), which is the supreme court's seminal decision on the principles that are the subject of Rule 431(b), and in *Glasper* itself, to permit an analysis that is less permissive and rationalizing of error.

There are three reasons why I think a different outcome from that in *Glasper* is both appropriate and necessary. The first is the fact and the progression of the amendments to Rule 431(b). The second relates to the mandatory application of the supreme court rules generally and this rule specifically. And third, the nature and character of the *Zehr* principles themselves

22

strongly argue that absolute compliance with the most recent version of the rule should be required.

Here it is undisputed that the trial court did not comply with the rule. The State conceded there was error; the majority so finds, and I agree. It is also undisputed that the defendant did not preserve the error. The issue he raises under Rule 431(b) is, therefore, forfeited. *People v. Allen*, 222 Ill. 2d 340, 350, 856 N.E.2d 349, 351 (2006). He can only secure consideration and relief if we can find plain error. 134 Ill. 2d R. 615(a).

In *People v. Herron*, the supreme court delineated two situations (a two-pronged test) in which a reviewing court can reach an unpreserved error: first, where the evidence is closely balanced, regardless of the nature of the error; or, second, where the error is so serious that the defendant was denied a substantial right and a fair trial, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 178-79, 830 N.E.2d 467, 475 (2005). The evidence in the instant case was not closely balanced, so we consider the availability of relief under the second prong of the plain error analysis. As the court explained, this second prong "guards against errors that erode the integrity of the judicial process and undermine the fairness of the defendant's trial." *Herron*, 215 Ill. 2d at 186, 839 N.E.2d at 479.

The same analytical framework–that is, analysis under the second prong–was followed by five panels of the First District (*People v. Anderson*, 389 Ill. App. 3d 1, 904 N.E.2d 1113 (2009); *People v. Graham*, No. 1-08-0444, 2009 Ill. App. LEXIS 689, 913 N.E.2d 99 (July 20, 2009); *People v. Wilmington*, No. 1–07–2518, 2009 Ill. App. LEXIS 936 (Sept. 24, 2009); *People v. Arredondo*, No. 1-07-2825 (October 8, 2009); *People v. Madrid*, No. 1-08-0324 (October 8, 2009)) and one panel of the Second District (*People v. Blair*, No. 2-077-0862, 2009 Ill. App.

23

LEXIS 944 (Sept. 29, 2009)). The appellate panels in these cases all found that the second prong of the plain error test had been satisfied, reversed the defendant's conviction, and ordered a new trial.

By contrast, I am aware of two cases reaching contrary results: an earlier decision by this same divided panel in the instant case (vacated pursuant to supervisory order) and the Fourth District's decision in *People v. Stump*, 385 Ill. App. 3d 515, 896 N.E.2d 904 (2008). In both of those cases, the error was found to be harmless and the convictions were affirmed. The majority's newly revised decision, relying on *Glasper*, again provides defendant with no relief, this time finding no plain error.

The error committed by the trial court in this case was in failing to require each juror to demonstrate, in response to questions asked by the court as required in Rule 431(b), that he or she fully understood and accepted the bedrock principles integral to the selection of an impartial jury and, thus, a fair trial. For the reasons that follow, I would find that the error satisfies the second prong of the plain error test and, therefore, cannot be harmless.

1. Progression of enactment and amendment of Rule 431(b).

Section (b) was added to Rule 431 in 1997 to ensure compliance with the principles enunciated by the court in its 1984 decision in *Zehr*. *People v. Anderson*, 389 Ill. App. 3d 1, 8, 904 N.E.2d 1113, 1119 (2009) ("Before that, in 1997, Rule 431 was amended to ensure compliance with the *Zehr* principles by changing the court's *voir dire* requirements from discretionary to compulsory by amending the word 'may' to 'shall' "). The 1997 change actually represented a compromise. The Supreme Court Rules Committee had recommended that the trial courts be required to question the jurors on each of the four *Zehr* principles. *People v. Glasper*,

24

2009 Ill. LEXIS 933, *13-14, citing Illinois Supreme Court Rules Committee, Recommendations to the Supreme Court of Illinois (March 1997). The supreme court, however, rejected that proposal, instead adding subsection (b), requiring the trial courts to undertake such questioning only if they were specifically requested by the defendant to do so.

Considering the simple fact of the variance between the recommendation of the rules committee and the change adopted by the court in 1997, and the fact that the supreme court rejected one in favor of the other, there is a clear conclusion to be drawn that the two approaches to ascertaining whether the jurors understood the *Zehr* principles were (and are), in fact, different. Then in 2007, the supreme court again amended Rule 431(b), this time adopting the procedure it had rejected ten years earlier in 1997. Given this sequence of events, it is logical to conclude that this newest amendment to the rule was added to address specific concerns, and that it makes a meaningful or significant change from the 1997 version which the court considered in *Glasper.*

In fact, every amendment to a rule is presumed to have a purpose, and that presumption requires the courts to consider the need for the amendment and the purpose it serves. *People v. Allen*, 313 Ill. App. 3d 842, 846, 730 N.E. 2d 1216 (2000). And, indeed, the *Glasper* court implicitly acknowledged a different purpose, stating that its decision did not apply to the most recent amendment to the rule. *Glasper,* 2009 Ill. LEXIS 933 at *35 ("this holding is limited to the version of Rule 431(b)(4) that was in effect at the time of the instant trial, and would not necessarily apply to subsequent versions of the rule").

The *Glasper* court also reserved its option of finding plain error under the second prong of the plain error test. *Glasper,* 2009 Ill. LEXIS 933 at *22-23. The court drew a distinction,

25

stating that even though the error in *Glasper* did not involve "a fundamental right, or even a constitutional protection," but rather "a right made available only by rule of this court *** [and] was not afforded to all defendants–only those defendants who chose to exercise it;" "a trial before a biased jury would constitute a structural error not subject to harmless error review." *Glasper*, 2009 Ill. LEXIS 933 at *22. *35. Specifically, the *Glasper* court said:

> "We emphasize that this holding is limited to the version of Rule 431(b)(4) that was in effect at the time of the instant trial, and would not necessarily apply to subsequent versions of the rule." (Emphasis added.) *Glasper,* No. 103937, 2009 Ill. LEXIS at *34-35

The court went on to explain that its holding was limited to the 1997 version of the rule, and specifically, to subsection (4) of section (b), and stated that a violation of that rule could constitute reversible error "[i]f the facts of this case demonstrated that the trial court's failure to question the venire in accordance with Rule 431(b)(4) resulted in defendant being tried before a biased jury *** as a trial before a biased jury would constitute structural error." The court continued:

> "We reject the idea that the trial court's failure to conduct Rule 431(b)(4) questioning makes it *inevitable* that the jury was biased, *particularly when the record before us demonstrates that the jurors in this case were both admonished and instructed against forming an adverse inference against defendant based on his decision not to testify.* To do so would require us to presume that

26

citizens sworn as jurors ignore the law and the jury instructions

given to them.  This notion is contrary to our precedent which

instructs us to make the opposite presumption. [Citation.]"

(Emphasis added.) *Glasper*, No 103937, 2009 Ill. LEXIS at *35-

36.

However, while it had previously chosen not to "mandate *Zehr* questioning in every

case," that is no longer the rule.

"As previously stated, when crafting the version of Rule 431(b)

applicable here, *this court had the opportunity to mandate Zehr*

*questioning in every case, but chose not to.  Instead, this court*

*made the right to Zehr questioning permissive.*  The court

intentionally structured Rule 431(b) so that the trial court's default

position was to refrain from *Zehr* questioning.  We conclude that a

violation of Rule 431(b), as applied in this case, does not require

automatic reversal and is amenable to harmless error review."

(Emphasis added.)  *Glasper*, No 103937, 2009 Ill. LEXIS at *35-

36.

The inference I would draw is that the supreme court recognizes that, if the jurors are not

questioned in accordance with the current mandatory version of the rule, there is a likelihood that

the jury may be biased, that structural error may occur, and that the conviction should be

reversed.

I would find that, given the supreme court's specific reservation of the issue in the instant

27

case, and also by logical conclusion based on the court's own permutations of its rule, that *Glasper* does not foreclose a finding of plain error and a decision to reverse the conviction and remand for a new trial.

So, given *Glasper*, how do we apply Rule 431(b) to this case? The rule as most recently amended states:

> *"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles*: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.
>
> "*The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section.*" (Emphasis added.) 177 Ill. 2d R. 431(b). Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007.

Under the newly-modified rule, every judge in a criminal case is charged with a duty to conduct a fair trial; and, to that end, has an affirmative obligation, *sua sponte*, to make sure each

juror has a working knowledge of and commitment to the fundamental requirements of the civic task he or she has undertaken. The court must fulfill that obligation set out in Rule 431(b)–during the jury selection process, *before* the trial begins. *Zehr*, 103 Ill. 2d at 477.

Presumably, the obligation rests with the judge because, at the beginning of trial, throughout the proceedings, and in giving the instructions of law prior to deliberations, it is constantly reiterated that while the jury is the finder of fact, the court is the giver of the law. Only *the judge's* pronouncements of law have the weight of authority. Moreover, the existence and language of the rule strongly suggest that the *Zehr* principles are so fundamental to producing an unbiased jury, as our system defines it, that instructing the jurors on them should not be dependent on the knowledge or skill or preparation time of the defendant's attorney, but should be assured to every defendant in every criminal court in our state by placing the responsibility directly on the trial judges.

2.      The mandatory nature of the supreme court rules generally and the specific language of mandate found in Rule 431(b) itself

We recognize that the court stated in *Glasper* that "[t]he violation of a supreme court rule does not mandate reversal in every case," citing to its decision in *People v. Houston*, 226 Ill. 2d 135, 874 N.E.2d 23 (2007). However, our supreme court has expressly stated on numerous occasions that its rules " ' "are not aspirational. They are not suggestions. They have the force of law, and the presumption must be that they will be obeyed and enforced as written." ' " *Rodriguez v. Sheriff's Merit Comm'n*, 218 Ill. 2d 342, 353, 843 N.E.2d 379, 385 (2006); quoting *Roth v. Illinois Farmers Insurance* Co., 202 Ill. 2d 490, 494, 782 N.E.2d 212, 215 (2002); quoting *Bright v. Dicke*, 166 Ill. 2d 204, 210, 652 N.E.2d 275, 277-78 (1995). The *Glasper*

29

court expressly reaffirmed this position. *Glasper*, No 103937, 2009 Ill. LEXIS at 16.

The *Stump* court's ruling failed to give effect to this directive and instead inappropriately expanded the supreme court's limited holding in *People v. Houston*, 226 Ill. 2d 135, 874 N.E.2d 23 (2007). The *Houston* court "emphasize[d] the limited scope of [its] decision." *Houston*, 226 Ill. 2d at 152, 874 N.E.2d at 34. Specifically, the court stated:

> "We emphasize the limited scope of our decision. We do not conclude that the failure to obtain the presence of a court reporter during *voir dire* creates, in itself, a *per se* presumption of ineffective assistance of counsel. [Citation.] Nor do we conclude that the mere failure to record *voir dire*, without any claim of error in the jury selection process, requires a remand for reconstruction of the jury selection proceedings. [Citation.] This is not to say, however, that our rules are unimportant. We point out that the difficulty presented in the case at bar could have been avoided had the trial judge simply followed the mandate of Rule 608(a)(9). This court has often noted that our rules are not mere suggestions. Rather, '[t]hey have the force of law, and the presumption must be that they will be obeyed and enforced as written.' [Citation.] The situation here confronting us illustrates the importance of our rules and the need for compliance with them." *Houston*, 226 Ill. 2d at 152, 874 N.E.2d at 34.

The above language illustrates the narrow reach of the *Houston* court's holding, clearly

showing that it is merely an exception to the general rule that supreme court rules must be enforced as written. The supreme court has the authority to make exceptions to its rules. We, at the appellate level, do not. Instead, we are bound to follow supreme court precedent, which requires strict compliance with and enforcement of supreme court rules as written.

If the supreme court wishes to make an exception to this general rule to hold that violations of the 2007 amended version of Rule 431(b) have no consequence, as it did in *Houston* for Rule 608(a)(9) violations, and in *Glasper* for violations of Rule 431(b)'s 1997 version, it can. However, until it does, we are not at liberty to excuse this violation. It is axiomatic in our judicial system that violations of law have consequences, at least in part to deter further violations. In order to give full effect to Rule 431(b) as currently written, I believe we must reverse defendant's conviction and remand the matter for a new trial that affords the defendant the protections the rule provides.

3.     The nature and character of the *Zehr* principles.

In support of its finding, the majority cites the *Glasper* court's reliance on its decision in *People v. Emerson*, 122 Ill. 2d 411, 522 N.E.2d 1109 (1987). (Slip op. at 18.) I acknowledge the 1987 holding in *Emerson* and the significance of the supreme court's statement in *Glasper* that in *Emerson*, it had "moved away from the portion of the *Zehr* holding which stated that the relevant questions should be covered 'in the course of interrogation on *voir dire*,' and that the failure to ask these questions amounts to 'prejudicial error,' " *Glasper*, No 103937, slip op. at 16.   I would note, however, that *Emerson* predates all versions of Rule 431(b), most particularly the 2007 amendment and all of the considerations that prompted the court to change the rule.

The nature and character of the *Zehr* principles play an integral role in the fairness of our

31

trials and the integrity of our system. The *Zehr* court described the principles as follows:

"We are of the opinion that essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of the trial will have little curative effect. *** We agree with the appellate court that '[e]ach of these questions goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury' [citation], and although they need not have been asked in precisely the form submitted, the subject matter of the questions should have been covered in the course of interrogation on *voir dire.*" *Zehr*, 103 Ill. 2d at 477.

The supreme court has thus told us that (1) these four principles are essential to seating a fair and impartial jury and are, therefore, integral to a fair trial in our judicial system; (2) each juror must understand each principle and his or her obligation to follow it throughout the trial; (3) for this reason, ensuring the jurors' understanding must be undertaken at the beginning of the trial, not at the end of the process; and (4) although no precise form of the questions is required, the subject matter must be covered.

What the *Zehr* court did not tell us, but what, if we think about it, each of us knows, is

that:  while these principles are familiar to and understood by those of us within the system, to potential jurors drawn from a pool of persons unfamiliar with trial procedures, they are inherently counter-intuitive.

- What do you mean, we have to presume the defendant is innocent?  Hasn't he been investigated, arrested, identified, arraigned, brought here in shackles, and aren't we here because all of these professionals believe he is guilty?  How long does this presumption last?  And when do I get to "find" what we already know – that he's guilty – and go home?

- The State must prove him guilty beyond a reasonable doubt!  If they doubted his guilt, he (and we) wouldn't be here.  He should have to prove he *didn't* do it, not the other way around.

- What is a reasonable doubt?  How does the presumption of innocence apply to how I consider reasonable doubt?

- If your story is true, you want to tell it so everyone will know you are telling the truth.   If he won't get on the stand and tell his story under oath, he must be lying.

To ensure that every juror knows that the very human biases they are influenced by outside the courtroom cannot apply once they get in the jury box, we do what the supreme court has modified Rule 431(b) to require.  We tell them what the core rules governing their search for legal truth are; and then we question them and encourage them to question us to ensure their understanding of and their commitment to honoring and complying with those principles.

Without following the strictures of Rule 431(b), we can have no real confidence that we have selected a panel of impartial jurors – men and women who have absorbed and acted within

33

the core principles by which we determine legal guilt. And yet, it is our *assumption* that the jurors have done so that lies at the heart of the standard of review enunciated by the supreme court in *People v. Collins*, 214 Ill. 2d 206, 824 N..2d 262 (2005). We do not review the jurors' verdict to assess whether they followed the *Zehr* principles; rather, we assume they have done so, and thus on review we are required to view their presumed factual findings in the light most favorable to their verdict convicting the defendant. If we cannot be sure that the jurors have understood and followed the *Zehr* principles, the reviewing courts are only compounding, rather than correcting, any errors.

Our supreme court has told us repeatedly that empaneling a fair and impartial jury is fundamental to the conduct of a fair trial and a fair and just verdict. Both our federal and state constitutions guarantee trial by an impartial jury. U.S. Const., amends VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13. See also *People v. Strain*, 194 Ill. 2d 467, 475, 742 N.E.2d 315 (2000). I would argue that the supreme court's prescription for achieving that goal is fundamental, is imperative, is structural, and a failure to follow it is an "error so serious that the defendant was denied a substantial right and a fair trial, regardless of the closeness of the evidence." *Herron*, 215 Ill. 2d at 178-79, 830 N.E.2d at 475.

For the foregoing reasons, I would find that the error in this case was plain error, that defendant's conviction must be vacated, and the case remanded for a new trial. I, therefore, dissent from the majority's contrary decision.