Sixth Division
November 24, 2010

No. 1-08-2264

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court |
| | ) | of Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | 05 CR 26441 |
| | ) | |
| ANTHONY McNEAL, | ) | Honorable |
| | ) | William Timothy O'Brien, |
| Defendant-Appellant. | ) | Judge Presiding. |

<u>MODIFIED UPON DENIAL OF PETITION FOR REHEARING</u>

JUSTICE McBRIDE delivered the opinion of the court:

Following a jury trial, defendant Anthony McNeal was convicted of two counts of aggravated criminal sexual assault and one count each of home invasion, armed robbery, and aggravated criminal sexual abuse. The trial court subsequently sentenced defendant to consecutive terms of 30 years for each count of the aggravated criminal sexual assault and concurrent terms of 20 years for home invasion, 20 years for armed robbery and 6 years for aggravated criminal sexual abuse, but to be served consecutive to the sentences for aggravated criminal sexual assault. In total, defendant received an aggregate sentence of 80 years in prison.

Defendant appeals, arguing that: (1) the trial court failed to question prospective jurors in compliance with Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007); (2) the trial court improperly allowed a witness to testify about the contents of a triage note prepared by a nontestifying witness because the note was inadmissible hearsay and violated defendant's constitutional right to confrontation; (3) the expert testimony of a fingerprint analyst failed to offer a foundation for her conclusion; (4) the trial

1-08-2264

court erroneously instructed the jury on a non-Illinois Pattern Jury Instruction definition of "sexual penetration"; (5) the State failed to prove defendant guilty of home invasion because no one was present in the house when it was entered; and (6) the trial court erred in imposing an unidentified $30 assessment and defendant is entitled to receive credit for the $200 "Sexual Assault Fine."

The trial court conducted defendant's jury trial in May 2008. At the start of jury selection, the trial court made the following statement.

"Under the law, the defendant is presumed to be innocent of the charges placed against him. This presumption remains with the defendant at every stage of the trial and is not overcome unless and until you are satisfied by the evidence presented in this case beyond a reasonable doubt as to the guilt of the defendant.

The State has the burden of proving the guilty of the defendant beyond a reasonable doubt. The State carries this burden throughout the case. The defendant is not required to prove his innocence. The defendant need not present any evidence at all. The defendant may rely upon this presumption of innocence."

Later, the trial court asked a series of questions of the venire as a group. The court asked the prospective jurors to raise their hands or nod in response to the questions.

"Do you understand and accept that a person accused of a crime is presumed to be innocent of the charges against him?

Again heads nodding yes.

2

That this presumption of innocence stays with the defendant throughout the trial and is not overcome unless from all the evidence you believe the State proved the defendant's guilt beyond a reasonable doubt?

Again, all heads are nodding yes, no hands raised.

Do you understand that this means that the State has the burden of proving the defendant's guilt beyond a reasonable doubt?

All heads nodding yes, no hands raised.

That the defendant does not have to prove his innocence?

Again, heads are nodding yes, no hands raised.

That the defendant does not have to present any evidence on his own behalf? Again, all heads nodding yes, no hands raised.

Do you have any disagreement with any of these principles of law?

Again, no hands raised."

Defendant did not object to the trial court's questioning of the jurors.

The following evidence was presented at defendant's trial.

M.Z. testified that on September 9, 2005, she lived with her boyfriend Bhawani Singh at 911 Sherman in Evanston. The building is a courtyard building and the outer entry door is unlocked to enter a vestibule with a locked inner door and buzzers for the individual apartments.

On that morning, Singh left for work shortly before 8 a.m. M.Z. was still home preparing for work. She was employed as a postdoctoral researcher at the University of Chicago. Several

minutes after Singh left, M.Z. heard the buzzer for the front door. She stated that she assumed Singh had forgotten something and pushed the button to open the inner vestibule door without asking who was there. No one entered her apartment and no one knocked on her door.

Approximately 5 to 10 minutes later, M.Z. left her apartment through the front door. As she turned to lock the door, she observed an African-American man standing in the stairwell. He was wearing an orange shirt and jeans with big pockets. She identified this man as defendant. Defendant said a name that M.Z. did not recognize. Then, he pulled out a knife, held it to M.Z.'s throat and threatened to kill her if she yelled. Defendant forced M.Z. back into her apartment. Defendant was behind M.Z. with his arms around her neck.

Inside the apartment, defendant began to look for money and valuables. He dumped the contents of M.Z.'s purse on the table and found $10 as well as credit cards and an automated teller machine (ATM) card. He asked M.Z. for her personal identification number (PIN) for the ATM card three times and told her he would kill her if she lied. M.Z. testified that she gave him the correct number and wrote it down for him when he asked. M.Z. stated that she was very scared and believed defendant would hurt her so she did whatever he asked of her.

Defendant asked M.Z. when she usually left for work and she said around 9 a.m. He told her to call her lab and tell them that she was not feeling well and would in late. M.Z. did as defendant instructed. Defendant then rummaged around the apartment looking for valuables. He opened drawers and closets. M.Z. told defendant that she had a large container of change in the dining room. Defendant got the container and told M.Z. to separate the quarters from the rest of the change.

While M.Z. was separating the change, defendant began to touch her "bottom part." She

4

testified that she said "no, please don't." Defendant did not stop. He unbuttoned her bra from outside her shirt and pulled her pants partway down. He told M.Z. to remove her pants and underwear. She complied. He told her to go into the bedroom. In the bedroom, defendant told M.Z. to lie on the bed. M.Z. testified that defendant "put his penis into [her] vagina." After less than a minute, defendant removed his penis and asked for a condom. M.Z. told him that she did not have a condom. Defendant "became very, very mad" and "put the knife right above [her] eyeball, almost going to cut [her] eyeball out." M.Z. said that she did not have condoms because she and her boyfriend were trying to have a baby. Defendant then released the knife. He told her to "f--- herself" and said he wanted to see a "real orgasm." Defendant then told M.Z. to "touch [her]self" and "to put [her] finger into [her] own vagina." Defendant felt her breasts while on the bed. M.Z. testified that defendant did not ejaculate at any time.

After 5 to 10 minutes, defendant told her to stop. He went into the living room and M.Z. followed, still naked from the waist down. He had her take the quarters from the dining room table to the living room table and she stacked the quarters. Defendant sat on the couch and told M.Z. to lie on top of him. M.Z. supported herself as she did not want to lie completely on defendant. Defendant then rubbed M.Z.'s vagina and buttocks. A few minutes later, defendant turned on the television.

Defendant began looking through M.Z.'s CDs, DVDs and electronics. He specifically picked up the movie "The Color Purple" and asked if it was "good." He also found her diplomas in a closet. He asked M.Z. for a shopping bag. She saw defendant put some of the quarters in his pockets and in the bag. He asked M.Z. if she had any "special underwear" and made her put on a pair of thong underwear.

1-08-2264

Around 9:30 a.m., defendant told M.Z. they were going shopping. He threatened to kill her and her boyfriend if she caused trouble while they were out. M.Z. stated that she believed defendant and promised defendant that she would not do anything stupid. M.Z. had one credit card in her purse and defendant had her ATM card. She did not know where her cell phone was at this time.

When they left, defendant asked where the closest ATM was located. M.Z. said a White Hen Pantry. As they walked toward the store, defendant saw a police car outside White Hen so he took her to the southbound Purple Line stop for the el train. Defendant gave M.Z. money to pay for the train. He used the quarters from M.Z.'s apartment. Defendant held M.Z.'s hand. They boarded a southbound train and rode to the Howard stop. At Howard, they transferred to a southbound Red Line train. They rode for about 20 minutes and exited at the Wilson stop.

After they exited the station, defendant took M.Z. to a store called City Sports, located at Wilson and Broadway. Inside the store, defendant selected several items with M.Z. nearby. They went to the register to pay. M.Z. handed her credit card to the employee, later identified as David Kim the store manager, to pay for the items. Kim asked for identification, but M.Z. did not have her identification as defendant had removed it from her purse when he dumped out the contents. Kim suggested they go to a nearby ATM. They left the items on the counter and left the store.

Defendant said he wanted to go back to M.Z.'s apartment to get her identification, but M.Z. said no, she would get money from an ATM. They went to bank nearby and located the ATM downstairs. Defendant gave M.Z. her ATM card and she withdrew the maximum allowed. Defendant took back M.Z.'s ATM card. They returned to City Sports, but still did not have

6

enough money. They went to an ATM inside the store and M.Z. withdrew about $200. They returned to the counter, paid for the items and left the store.

During M.Z.'s testimony, the State played two separate video recordings from security cameras in City Sports. M.Z. testified that the videos showed her entering the store with defendant, going to the counter, using the ATM and purchasing the items.

After they left City Sports, defendant had M.Z. go to another bank and withdraw money. She withdrew between $300 and $400. Defendant took the money and the ATM card. The parties stipulated that M.Z.'s ATM card was used to make three withdrawals between 10:58 a.m. and 11:15 a.m. on September 9, 2005, for approximately $200, $200 and $300.

Defendant asked M.Z. where she was going and she said that she would take the Red Line south to 55th Street and then take a bus to work. They boarded the Red Line together. M.Z. exited the train at 55th Street while defendant remained on the train. M.Z. then took a bus to work at the University of Chicago.

When she got to work, M.Z. called her boyfriend and told him what happened. He said he would come get her. She told her coworkers what happened, but did not tell them of the sexual assault. On a coworker's advice, she went to a nearby Citibank branch and canceled her ATM card. The teller at Citibank asked M.Z. if she wanted to call 911. She was forwarded to the Evanston police department. When her boyfriend arrived, he drove them to the Evanston police department. They arrived at around 5 p.m.

M.Z. spoke with police for about an hour and then went to the Evanston Northwestern Hospital. She was examined and a sexual assault kit was collected. After her examination, M.Z. went to stay with a friend downtown. She never stayed in that apartment again.

1-08-2264

The following day, M.Z. spoke again with the police. She went with the police to City Sports and the banks where she withdrew money. About a week later on September 17, 2005, M.Z. called the police. While she was packing her apartment, she found a CD and CD player that did not belong to her. She turned those items over to the police.

David Kim testified that just before 11 a.m. on September 9, 2005, he saw a man and a woman enter the store. He identified defendant as the man and described the woman as "an oriental lady." Kim stated that he had seen defendant a week to two weeks prior to that date in the store. On that visit, defendant grabbed some new Nike Air Jordans near the register and said he would be back for them. On September 9, 2005, Kim observed defendant and the woman shopping. He said the woman followed defendant. He described her as looking "like a state of shock, *** kind of scared." His testimony about the transaction was substantially the same as M.Z.'s testimony. He noted where the video cameras were located in the store, one overlooking the register and another at the ATM machine. He stated that the video recordings accurately recorded the events of the morning. He gave the police the video recordings and a duplicate copy of the transaction receipt. On cross-examination, Kim said he could not remember if he told the police he had seen defendant in the store prior to September 9, 2005.

Kristin Yates testified that she is employed as a registered nurse and on September 9, 2005, she was working at Evanston Northwestern Hospital. She stated that she treated M.Z. on that date. Prior to M.Z.'s examination, Yates testified that she reviewed the triage note written by another nurse because it was "medically important for her to treat the patient." When the State asked Yates what she learned from the triage note, defendant objected, which the trial court overruled.

8

Yates testified that the triage note indicated that M.Z. came in that evening and said she had been sexually assaulted earlier that day. The triage note stated "that there was penetration for less than a minute." It also said that M.Z.'s breasts and vagina had been touched. The note described M.Z. as "calm but cooperative."

Yates stated that she worked with doctors to perform a sexual assault kit. She followed the step-by-step process for the kit, which included M.Z. standing on a sheet and removing her clothes. Then her hair was combed, including pubic hair. Yates scraped underneath M.Z.'s fingernails for any evidence. M.Z. also provided a urine sample. Yates was present when the doctor performed a pelvic exam in which swabs were taken from M.Z.'s vagina, anus, inner thigh and mouth. The final step of the kit was to draw blood from M.Z. After it was done, Yates reviewed everything to make sure it was signed, sealed and labeled. She sealed the kit and it was given to the police. During the examination, Yates described M.Z. as "tearful." M.Z. received numerous medications and injections to prevent pregnancy and sexually transmitted diseases.

Detective Mark Dobrowolski testified that he is employed as a detective with the Evanston police department. He stated that on September 9, 2005, he was working with Detective Dugan. They received an assignment to interview a victim of a sexual assault. They met with M.Z., along with a victim witness advocate at the Evanston police station. She told them what happened and gave a description of her attacker. The interview lasted about 40 minutes. He also spoke with Singh, M.Z.'s boyfriend.

Later, Detective Dobrowolski went to 911 Sherman with Detective Dugan and Sergeant Melvin Collier, the evidence technician. Detective Dobrowolski described the apartment as being in "disarray." He stated that items were on the floor, CDs and DVDs were lying on the

floor, and change was on the table. In the bedroom, he saw clothes and luggage lying on the bed and the contents of the closet pulled into the room. Sergeant Collier testified that he recovered a fitted sheet from the bed and several latent fingerprints from CDs, DVDs and their cases.

The parties stipulated that two calls were made from M.Z.'s cell phone on September 9, 2005. Detective Carlos Mitchem testified that he worked for the Evanston police department and worked on this case as well. Detective Mitchem stated that he left a message at the second number on the cell phone records and received a phone call in response from Mark Newberry on September 17, 2005. After that call, Detective Mitchem obtained a photo of defendant. He recognized defendant from the surveillance videos from City Sports. He took the photo and went to Newberry's residence at 7036 South Creiger in Chicago.

On September 18, 2005, Detective Mitchem and Detective Jeremy Nieman with M.Z. and showed her a photo array. She identified one of the men as defendant. Later that day, Detective Mitchem spoke with Newberry. Following that call, Detectives Mitchem and Nieman drove to the 7000 block of South Creiger and set up surveillance to find defendant. They arrested defendant outside 7036 South Creiger. The police recovered a portable CD player from defendant during the arrest. At trial, M.Z. testified that it "definitely look[ed] like" her missing CD player.

Following defendant's arrest, Detectives Mitchem and Nieman placed defendant in an interview room at the Evanston police department. Detective Nieman read defendant his Miranda rights and had defendant repeat each line aloud. Defendant indicated that he understood each admonishment, but waived his rights and agreed to talk to the detectives.

Detective Nieman testified about defendant's statement. Defendant said he was in

10

Evanston on the morning of September 9, 2005, to visit a friend who lived near the intersection of Sherman and Lee. Detective Nieman stated that defendant did not provide a name or address for his friend and was unable to provide a description of his friend's house. Defendant said he started walking on Sherman and for an unknown reason he turned into the courtyard of 911 Sherman. He entered the vestibule and rang several buzzers. When someone buzzed him inside the building, he entered the stairwell and saw a woman on the stairs. Defendant did not know the woman and during the interview, he did not know her name. Defendant told the detective that the pulled a knife, "placed it to the victim's throat and forced her back into the apartment." He said "he told her not to scream or he would kill her."

Once inside the apartment, defendant dumped out the contents of the woman's purse. He said he was looking for money and valuables. He found a small amount of cash, credit cards and ATM debit cards. He said he told the woman to give him the PIN and had her repeat it multiple times. He admitted to saying to her that "if she lied to him, he would come back and kill her." Defendant told the detective that he was not going to come back and kill her, but he wanted to scare her. Defendant said the woman told him there was a container of change in the apartment and he made her sort out the quarters. Defendant sat down near the woman and instructed her to remove her clothing.

He told the woman to go into the bedroom and lie down on the bed. Defendant said he asked her to touch herself. He admitted that he touched her vagina and breasts. He said he asked her if she had a condom and she answered that she did not have any condoms as she was trying to get pregnant.

Defendant then walked back to the living room and told the woman to get dressed. He

11

said they sat on the couch and watched television. Later, they left the apartment to go to an ATM. Defendant said the woman was scared and he admitted that he still had the knife on his person. They boarded the southbound el train and went to Wilson and Broadway. Defendant stated that he went there because he was familiar with the area and went to a sports store. They went to the sports store and he picked several items. Detective Nieman testified that defendant pointed to the Nike Air Jordans he was wearing during the interview and said they were bought then. When they went to pay, defendant said they were not allowed as the woman did not have her identification. He said he forced her to go to multiple ATMs to withdraw money. He stated that in one of the banks a security guard was present, but even though the woman was scared, she "did not yell out or say anything to them." They returned to the store and paid for the items. Then they returned to the train. The woman told defendant she needed to go to work and her stop was 55th Street. Defendant told her that "she should not call the police or try anything because he would come back and kill both her and her fiancé." Defendant saw her get off the train, but he did not exit.

Defendant told the detective that "it appeared that the victim did want to stay with him the entire time." Defendant believed this because "she did not make any outcries or try to run." Defendant said he threw the knife off the Wilson station platform prior to going to City Sports. He also stated that the victim gave him the CD player.

The interview lasted about 35 minutes. At the conclusion, Detective Nieman asked defendant if he wanted memorialize the statement with an assistant State's Attorney (ASA). Defendant declined. ASA Robin Kerensky also spoke with defendant while Detective Nieman was present. She introduced herself and advised defendant of his Miranda rights. Defendant

again told the events of the day. Detective Nieman testified that the substance of the statement was the same as what defendant had previously told him. At the conclusion, ASA Kerensky asked if defendant wanted to memorialize his statement and again he refused.

The next day, September 19, 2005, M.Z. returned to the Evanstion police station to view a lineup. She identified defendant, the man in the third spot as her attacker. Detective Nieman said defendant was able to pick his position in the lineup and he picked the third position. After M.Z.'s identification, Detective Nieman along with Detective Mitchem spoke with defendant again. Defendant was given his Miranda rights, but agreed to talk. The detectives informed defendant that he had been identified in a lineup. Detective Nieman testified that defendant said, "why are we talking about this? I already told you I did it." Detective Nieman informed defendant that M.Z. had given a conflicting description of what occurred in the bedroom and asked if there was anything defendant wanted to add. Defendant said "there was nothing that he wanted to add with the exception that he did not insert his penis into her vagina. He did instruct her to touch her clitoris and he also touched her [clitoris]." Detective Nieman told defendant that M.Z. stated that he had placed his penis in her vagina, but defendant denied it. Detective Nieman asked defendant if he would like to give a written statement, but defendant refused.

Later, on September 21, 2005, Detective Mitchem received another call from Newberry and subsequently recovered a cell phone that was registered to M..Z.'s cell phone number. M.Z. identified the cell phone in court as her missing cell phone.

Prior to the testimony of the fingerprint expert, defense counsel told the trial court that it had received a corrected "latent print matrix" worksheet from the crime lab the previous day. The new worksheet indicated that one fingerprint was "inconclusive" and after further testing,

another report found a match to defendant. Defense counsel moved for a mistrial based on an alleged discovery violation as the corrected worksheet was not disclosed to defense counsel prior to trial, despite a meeting with the fingerprint expert the previous week. The trial court denied the motion for a mistrial and denied defendant's motion to bar the State's use of the corrected matrix at trial.

Lori Webert testified that she is employed as a fingerprint analyst with the crime lab. She was found to be an expert in fingerprint analysis. She stated that she received nine latent fingerprint lifts from the case. Her job was to develop, analyze, compare and evaluate latent fingerprints to known inked standards. Her evaluation was to compare the unknown print with the known standard under a magnifier and locate specific features to match a fingerprint.

She originally received noninked standards from M.Z., Singh, and defendant. The standards from M.Z. and Singh were used as elimination prints as their fingerprints would be expected at their apartment. Webert was unable to make a determination and requested inked fingerprint standards. Webert testified that the original cards did not have sufficient information to make an identification. After she received the inked standards, Webert stated that she matched the fingerprint recovered from the case to the movie "The Color Purple" to defendant's inked standard. She testified that she made this determination within a reasonable degree of medical certainty.

On cross-examination, Webert testified that she does not document what features she matched in the unknown latent and standard prints. She was unable to state what features were matched from defendant's inked standard and the unknown latent print. Webert also stated that the correction on the matrix worksheet was a clerical error. The original worksheet indicated that

defendant's fingerprints were not a match to the unknown latent prints, but it should have stated that the results were inconclusive. She said it did not affect her results.

After the State rested its case-in-chief, defendant moved for a directed verdict, which the trial court denied.

Defendant presented the testimony of Keia Brown. Brown testified that she is employed as forensic scientist with the biology deoxyribonucleic acid (DNA) section of the crime lab. She stated that she received evidence from this case to test for the presence of semen or sperm. She tested M.Z.'s clothing and the swabs of her vagina, inner thigh, rectum, and mouth. All of these tests were negative for the presence of semen or sperm. She also tested a bed sheet. She found six areas that tested positive for semen, but were a match to Singh. None matched defendant.

Defendant recalled Detective Dobrowolski and questioned him on information not included in his reports, such as, M.Z. telling him that defendant asked M.Z. to wear "special underwear" and M.Z. stating that defendant asked for her PIN three times. Defendant also called Officer Heidi Bernhardt. She testified that she accompanied a detective to 911 Sherman to recover a portable CD player and an empty CD case with a Mary J. Blige label. Following her testimony, defendant rested. The State offered no evidence in rebuttal.

Following deliberations, the jury found defendant guilty of one count of aggravated criminal sexual assault involving defendant's penis in contact with M.Z.'s vagina, one count of aggravated criminal sexual assault involving the intrusion of M.Z.'s finger into her vagina, one count of home invasion, one count of armed robbery and one count of aggravated criminal sexual abuse. Defendant filed a motion for a new trial, which the trial court denied. At the subsequent sentencing hearing, the trial court sentenced defendant to consecutive prison terms of 30 years for

each count of aggravated criminal sexual assault. The court also sentenced defendant to concurrent prison terms of 20 years for home invasion, 20 years for armed robbery, and 6 years for aggravated criminal sexual abuse, to be served consecutive to the sentences for aggravated criminal sexual assault.

The trial court also imposed $1,035 monetary judgment on defendant. This judgment included a $200 "Sexual Assault Fine" and a miscellaneous $30 fee entered under the "Other as Ordered by the Court" with a notation of "CAC." The court did not grant defendant any credit towards his monetary judgment. Defendant filed a motion to reconsider his sentence, which the trial court denied.

This appeal followed.

First, defendant argues that the trial court failed to question the potential jurors in compliance with Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007). Specifically, defendant asserts that the trial court committed reversible error when it failed to ask prospective jurors if they understood and accepted the principle that defendant's decision not to testify cannot be held against him. Defendant admits that he did not object to the trial court's questioning at trial or in a posttrial motion, but contends that defense counsel was not required to object to a violation of Rule 431(b) because such a requirement would be inconsistent with the purpose of the amendment to Rule 431(b). This argument has previously been rejected as a ground for avoiding forfeiture and we similarly find defendant's argument unpersuasive. See People v. Hammonds, 399 Ill. App. 3d 927, 949-50 (2010) ("Defendant's failure to object at trial robbed the trial court of the opportunity to correct the error, and defendant's failure to object in a posttrial motion deprived a reviewing court of any

16

factual findings which the trial court might have made concerning the credibility of the witnesses and their contribution to the weight of the evidence against defendant and, thus, the possible harmlessness of the error"); People v. Russell, 395 Ill. App. 3d 926, 937 (2009) ("Although our supreme court elected to place the duty squarely on the shoulders of the court to comply with the directive contained in the current Supreme Court Rule 431(b), the amended rule does not alleviate either counsel for the State or counsel for the defense of an obligation to object when a trial judge inadvertently overlooks the applicability of Rule 431(b)").

Alternatively, if defense counsel was required to object, defendant asks this court to review the issue as plain error. The State maintains that defendant has forfeited this issue and defendant has not demonstrated that this was plain error. Further, the State responds that any error was harmless.

To preserve an issue for review, defendant must both object at trial and in a written posttrial motion. People v. Enoch, 122 Ill. 2d 176, 186 (1988). Failure to do so operates as a forfeiture as to that issue on appeal. People v. Ward, 154 Ill. 2d 272, 293 (1992). However, defendant asks this court to review this issue as plain error. Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a). The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's

trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." People v. Piatkowski, 225 Ill. 2d 551, 565 (2007), citing People v. Herron, 215 Ill. 2d 167, 186-87 (2005).

Defendant carries the burden of persuasion under both prongs of the plain error rule. People v. Lewis, 234 Ill. 2d 32, 43 (2009). Defendant does not assert that the evidence was closely balanced and relies on the second prong, contending that the trial court's failure to question prospective jurors under Rule 431(b) denied him a substantial right to a trial by a fair and impartial jury. However, "[t]he first step of plain-error review is to determine whether any error occurred." Lewis, 234 Ill. 2d at 43. Therefore, we will review the issue to determine if there was any error before considering it under plain error.

In People v. Zehr, 103 Ill. 2d 472, 476-78 (1984), our supreme court held a trial court erred during *voir dire* by refusing the defense counsel's request to ask questions about the State's burden of proof, defendant's right not to testify, and the presumption of innocence. The supreme court held that "essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him." Zehr, 103 Ill. 2d at 477.

In 1997, the supreme court amended Rule 431 to ensure compliance with the requirements of Zehr. 177 Ill. 2d R. 431, Committee Comments, at lxxix. Following the amendment, Rule 431(b) required that, if requested by the defendant, the court shall ask the potential jurors, individually or as a group, whether they understand the Zehr principles. 177 Ill. 2d R. 431(b). The rule "seeks to end the practice where the judge makes a broad statement of the

18

applicable law followed by a general question concerning the juror's willingness to follow the law." 177 Ill. 2d R. 431, Committee Comments, at lxxix. In 2007, the supreme court amended Rule 431(b) to require the trial court to *sua sponte* ask the potential jurors about the Zehr principles.

The amended Rule 431(b) provides:

"(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007.

Here, defendant asserts that the trial court did not comply with Rule 431(b) because it failed to ask the jurors whether they understood and accepted the principle that defendant's failure to testify cannot be held against him. The State concedes that the trial court failed to ask

the jurors if they understood and accepted this principle. Since the trial court did not ask the jurors about all four principles, it erred. Thus, the question before us is whether the trial court's failure to ask specifically about each of the four principles outlined in Rule 431(b) constitutes plain error. There is a split within the appellate court on that question.[1]

One line of cases, upon which defendant relies, held that a trial court's failure to comply with the 2007 amended version of Rule 431(b) is subject to plain-error review because it denies a defendant a substantial right and a fair trial and therefore is subject to automatic reversal without the need to inquire into the prejudice to the defendant. See People v. Graham, 393 Ill. App. 3d 268 (2009); People v. Wilmington, 394 Ill. App. 3d 567 (2009); People v. Blair, 395 Ill. App. 3d 465 (2009); People v. Arredondo, 394 Ill. App. 3d 944 (2009); People v. Madrid, 395 Ill. App. 3d 38 (2009); People v. Blanton, 396 Ill. App. 3d 230 (2009); People v. Anderson, 399 Ill. App. 3d 856 (2010).

Another line of cases has held that the failure to comply with the 2007 amended Rule 431(b) is not a structural error and therefore does not require automatic reversal. See, *e.g.*, People v. Wheeler, 399 Ill. App. 3d 869, 879 (2010); People v. Haynes, 399 Ill. App. 3d 903, 914 (2010); People v. McCovins, 399 Ill. App. 3d 323, 328 (2010); People v. Hammonds, 399 Ill. App. 3d 927, 955 (2010); People v. Magallanes, 397 Ill. App. 3d 72, 93 (2009); People v. Alexander, 396 Ill. App. 3d 563, 576 (2009); People v. Amerman, 396 Ill. App. 3d 586, 593-96 (2009). The outcomes in the cases relied upon by defendant and the State turn predominately

---

[1] We note that this issue is currently pending before the Illinois Supreme Court in People v. Thompson, No. 1-07-2891 (2009) (unpublished order under Supreme Court Rule 23), *appeal allowed*, 234 Ill. 2d 547 (2009).

1-08-2264

upon an interpretation of our supreme court's decision in People v. Glasper, 234 Ill. 2d 173 (2009). Accordingly, we begin our analysis by reviewing that decision.

In Glasper, 234 Ill. 2d at 189, the supreme court considered whether the trial court's failure to comply with an earlier version of Rule 431(b), which placed the burden of asking for Zehr questioning upon the defense, gave rise to a presumption of prejudice and required automatic reversal or whether the error was subject to harmless error review. The trial court in that case had instructed the jurors concerning the four Zehr principles in Rule 431(b) but declined the defendant's request to ask the jurors whether they understood and accepted the fourth principle.

The court observed that its decision in Zehr could be construed to require automatic reversal, but the court rejected such a rule and stated that "[r]equiring *per se* reversal for a Rule 431(b)(4) violation *** would be contrary to principles espoused by this court in other, analogous cases decided after Zehr." Glasper, 234 Ill. 2d at 197. The court further observed that automatic reversal was only required where an error was deemed structural, which the court noted was confined to a limited number of cases and which the court defined as "a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " Glasper, 234 Ill. 2d at 197-98, quoting Herron, 215 Ill. 2d at 186; see also People v. Rivera, 227 Ill. 2d 1, 19-20 (2007). The court concluded that the trial court's error did "not rise to the level of structural error." Glasper, 234 Ill. 2d at 199.

The court stated that the failure to ask a jury venire whether they understood and accepted that the defendant's failure to testify cannot be held against him "does not involve a fundamental right, or even a constitutional protection"; rather, "[t]he error involves a right made available

21

only by rule of this court." Glasper, 234 Ill. 2d at 193. Thus, although the rule was designed to help ensure that a defendant is tried before a fair jury, the court could not say that "Rule 431(b)(4) questioning is indispensable to a fair trial." Glasper, 234 Ill. 2d at 196. Further, the Glasper court noted that in People v. Emerson, 122 Ill. 2d 411 (1987), it "moved away from the portion of the Zehr holding which stated that the relevant questions should be covered 'in the course of interrogation on *voir dire*,' and that the failure to ask these questions amounts to 'prejudicial error.' " Glasper, 234 Ill. 2d at 197, quoting Zehr, 103 Ill. 2d at 477-78. The court also observed that in People v. Daniels, 172 Ill. 2d 154, 165 (1996), it had "expressed a reluctance to hold that automatic reversal was required for a violation of a 'right' conferred upon defendants by rule of this court." Glasper, 234 Ill. 2d at 197.

Although the court in Glasper emphasized that its holding was limited to the previous version of Rule 431(b), we agree with the appellate decisions that have found the court's analysis in Glasper equally applicable to the current version of the rule which requires the court in all cases to pose Zehr questions to the prospective jurors. See Wheeler, 399 Ill. App. 3d at 879 (noting the defendant's failure to offer a persuasive reason as to how the amended rule denied him a fair trial when the defendant in Glasper was not); Haynes, 399 Ill. App. 3d at 914; Hammonds, 399 Ill. App. 3d at 954-55 ("The 2007 amendment merely increased what fell under the scope of mandatory, and our supreme court in Glasper already answered what happens when there is a violation of what is mandatory under the rule and what happens is a harmless error analysis"); Magallanes, 397 Ill. App. 3d at 92 ("there is no quantitative or qualitative difference between the trial court failing to admonish jurors when requested to do so, as in Glasper, and when the trial court fails to admonish jurors under the amended rule"); Alexander, 396 Ill. App.

3d at 576 (finding that the difference between the current and previous versions of Rule 431(b) did not preclude application of the <u>Glasper</u> rational to the trial court's noncompliance with the current version of the rule); <u>Amerman</u>, 396 Ill. App. 3d at 595.

We also agree with the portion of these decisions which have found that, although <u>Glasper</u> was a harmless error case, the court's discussion regarding structural error was applicable to consideration of a Rule 431(b) violation under the second prong of the plain error test. See <u>Wheeler</u>, 399 Ill. App. 3d at 879 ("we are persuaded that its analysis applies with equal force against a presumption-of-prejudice finding that a second-prong plain error would trigger in this case"); <u>Haynes</u>, 399 Ill. App. 3d at 914 (concluding that the failure to comply with Rule 431(b) was not plain error); <u>Hammonds</u>, 399 Ill. App. 3d at 958 (error was not so serious to have affected the fairness of the defendant's trial); <u>Magallanes</u>, 397 Ill. App. 3d at 100 (noting that since the error in that case "was not quantitatively or qualitatively different from the error found to be harmless in <u>Glasper</u>," the defendant failed to prove that the error caused a severe threat to his trial under <u>Herron</u>); <u>Alexander</u>, 396 Ill. App. 3d at 575 (noting that "when defining 'structural error', the <u>Glasper</u> court quoted language in <u>Herron</u> that describes the substantial rights prong of the plain error test"); <u>Amerman</u>, 396 Ill. App. 3d at 594-95 (finding the rational regarding structural error in <u>Glasper</u> applicable to the second prong of the <u>Herron</u> test).

Having concluded that a violation of Rule 431(b) does not require automatic reversal and is subject to the plain error test, we must consider whether plain error exists in this case. We find that it does not. Here, the trial court failed to question the venire on the principle that it could not hold defendant's failure to testify against him. However, the prospective jurors were informed that defendant was not required to present any evidence nor did he have to prove his innocence

23

and may rely on the State's inability to prove him guilty. Further, we note that the trial court instructed the jury on all four principles prior to deliberations.

Recently, the reviewing court in People v. Patrick, No. 2-08-0745 (July 27, 2010), reached the same conclusion after a trial court failed to admonish jurors about the fourth principle, not to hold defendant's decision not to testify against him. "[D]efendant does not argue, nor do we find any evidence in the record to support, that he was prejudiced by the trial court's failure to individually ask prospective jurors whether they accepted the principle that in delivering a verdict they could not use against him defendant's decision not to testify." Patrick, slip op. at 27. The court noted that the jurors were advised of the four principles prior to questioning and they were instructed verbally and in writing on that principle prior to deliberations. Patrick, slip op. at 27. While the trial court in the present case did not include this principle in its opening remarks, it did inform the prospective jurors that defendant was presumed innocent, was not required to prove his innocence, need not present any evidence at all and may rely on the presumption of innocence, and the jury received the instruction that it could not hold defendant's failure to testify against him. Defendant has not shown how this failure prejudiced his trial.

Under these circumstances, defendant has failed to show that the trial court's error "was so serious that it affected the fairness of [his proceeding] and challenged the integrity of the judicial process." Herron, 215 Ill. 2d at 187. Accordingly, the error in this case does not rise to the level of plain error and we find that it is forfeited.

Next, defendant contends that the trial court improperly admitted Yates's testimony about the triage note prepared by another nurse at trial as it was inadmissible hearsay and violated his

right to confront witnesses against him. The State maintains that the triage note was not inadmissible hearsay and its admission did not violate defendant's right to confrontation.

During the trial, Yates testified that she "reviewed a triage note written by a fellow nurse" as it was medically important to treat M.Z. Yates learned from the triage note that M.Z. had been sexually assaulted and "that there was penetration for less than a minute and that he I [*sic*] believe [*sic*] was with her for a period throughout the day." It also indicated that defendant had touched M.Z.'s breasts and vagina. Yates then assisted in administering a sexual assault kit and offering medication to prevent pregnancy and disease.

We first consider whether the note was inadmissible hearsay. Hearsay is an out-of-court statement offered to prove the truth of the mattered asserted. People v. Gonzalez, 379 Ill. App. 3d 941, 954 (2008). Generally, hearsay statements are inadmissible, but the rule has certain exceptions. Hammonds, 399 Ill. App. 3d at 941. However, we first must decide whether the testimony was hearsay before determining if an exception is applicable. A trial court has discretion to determine whether statements are hearsay and if so, whether admissible under an exception. Thus, we will reverse a trial court's hearsay ruling only for an abuse of discretion. Hammonds, 399 Ill. App. 3d at 941-42.

Here, defendant does not challenge the statements made by M.Z. to the triage nurse as hearsay, but instead focuses on Yates's testimony about the contents of the triage note. Defendant asserts that Yates's testimony "served to corroborate M.Z.'s testimony" and the triage note's contents were offered to prove the truth of the matter asserted, *i.e.*, that M.Z. had been sexually assaulted. The State responds that Yates's testimony about the triage note was not used to prove the truth of the matter asserted, but to explain Yates's actions in treating M.Z. We agree

25

with the State. Yates's testimony about the triage note was not used to corroborate M.Z.'s testimony, but to explain Yates' treatment of M.Z. After Yates briefly testified about what she learned from the triage note, the substance of her testimony concerned her participation in treating M.Z. for a sexual assault. We point out that the triage note itself was not admitted into evidence by the State. This testimony was not presented to prove the truth of the matter asserted, but to provide the basis for M.Z.'s medical treatment. Accordingly, the complained-of testimony was not hearsay and was properly admitted.

Moreover, even if Yates's testimony about the triage note was hearsay, it falls within an exception. Section 115-13 of the Code of Criminal Procedure of 1963 offers a statutory exception to the hearsay rule for statements made for the purpose of medical diagnosis. 725 ILCS 5/115-13 (West 2006).

> "In a prosecution for violation of Section 12-13, 12-14,
> 12-14.1, 12-15 or 12-16 of the 'Criminal Code of 1961,' statements
> made by the victim to medical personnel for purposes of medical
> diagnosis or treatment including descriptions of the cause of
> symptom, pain or sensations, or the inception or general character
> of the cause or external source thereof insofar as reasonably
> pertinent to diagnosis or treatment shall be admitted as an
> exception to the hearsay rule." 725 ILCS 5/115-13 (West 2006).

We note that this exception is applicable to the present case because defendant was prosecuted for two of the triggering offenses: aggravated criminal sexual assault (720 ILCS 5/12-14 (West 2004)) and aggravated criminal sexual abuse (720 ILCS 5/12-16 (West 2004)).

26

Defendant asserts that the medical treatment exception is not applicable to this case because M.Z.'s statements were made to the triage nurse, not Yates. According to defendant, this exception only includes the testimony of the victim's statement to the testifying medical personnel, meaning that only the triage nurse could testify about M.Z.'s statements. However, contrary to defendant's interpretation, the statutory exception includes no such limitations on "statements made by the victim to medical personnel for purposes of medical diagnosis or treatment." 725 ILCS 5/115-13 (West 2006). "The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature." In re Donald A.G., 221 Ill. 2d 234, 246 (2006). "The best evidence of legislative intent is the language of the statute, and when possible, the court should interpret the language of a statute according to its plain and ordinary meaning." In re Donald A.G., 221 Ill. 2d at 246.

Section 115-13 creates an exception to the hearsay rule for the admission of a victim's statements made for the purpose of medical treatment. The statutory exception does not require the testifying medical personnel to have been the individual who heard the victim's statement firsthand. Defendant's interpretation of the exception adds limitations that the legislature did not include in the statutory language. Further, we note that defendant fails to cite any relevant case law to support this limitation on the medical personnel exception to the hearsay rule. The only case cited by defendant involved a physician testifying that a victim's mother informed him that her daughter had been sexually assaulted. See People v. Fuelner, 104 Ill. App. 3d 340, 346-47 (1982). Defendant's reliance on Fuelner is misplaced because it predates the enactment of section 115-13 and it did not involve a victim's own statement to medical personnel. We conclude that even if Yates's testimony about the triage note was hearsay, it was admissible

27

under the exception provided in section 115-13.

We now consider whether Yates's testimony about the triage note violated defendant's sixth amendment confrontation rights. Defendant contends that the statements by the nurse-author to Yates via the triage note violated his confrontation rights. The sixth amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." U.S. Const., amend. VI. This part of the sixth amendment is known as the confrontation clause and applies to the states through the fourteenth amendment. People v. Stechly, 225 Ill. 2d 246, 264 (2007). In Crawford v. Washington, the Supreme Court held "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually proscribes: confrontation." Crawford v. Washington, 541 U.S. 36, 68-69, 158 L. Ed. 2d 177, 203, 124 S. Ct. 1354, 1374 (2004). "However, the Crawford Court explicitly declined to define what exactly makes a statement 'testimonial.' " Stechly, 225 Ill. 2d at 266; see Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. But the Crawford Court pointed out that "[t]he [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. See Tennessee v. Street, 471 U.S. 409, 414[, 85 L. Ed. 2d 425, 430-31, 105 S. Ct. 2078, 2081-82] (1985)." Crawford, 541 U.S. at 59 n.9, 158 L. Ed. 2d at 197 n.9, 124 S. Ct. at 1369 n.9.

The Supreme Court later clarified in Davis v. Washington, 547 U.S. 813, 821, 165 L. Ed. 2d 224, 237, 126 S. Ct. 2266, 2273 (2006), that it is the only "testimonial" statements that "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." "It is the testimonial character of the statement that separates it from other hearsay that, while subject to

28

traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Davis, 547 U.S. at 821, 165 L. Ed. 2d at 237, 126 S. Ct. at 2273. The Illinois Supreme Court in Stechly held that a "testimonial" statement under Crawford is one made in a solemn fashion and the statement intended to establish a particular fact. Stechly, 225 Ill. 2d at 281-82. The Stechly court explained that on the second part, "the focus is on whether, at the time the statement was made, the witness was acting in a manner analogous to a witness at trial, describing or giving information regarding events which had previously occurred." Stechly, 225 Ill. 2d at 282. The court further held that when the statement is the product of police or law enforcement questioning the objective intent of the questioner is the focus. But when the statement is not the product of police interrogation, "the proper focus is on the intent of the declarant and the inquiry should be whether the objective circumstances would lead a reasonable person to conclude that his statement could be used against the defendant." In re Rolandis G., 232 Ill. 2d 13, 31 (2008), citing Stechly, 225 Ill. 2d at 288-89.

Here, our review is concerned with the second circumstance as the triage note is not a product of police interrogation. The triage note was written by a nurse when M.Z. first presented at the hospital for treatment following a sexual assault. The declarant's intent, the triage nurse, was to gather information from M.Z. for further treatment. The note was prepared in the course of M.Z.'s medical treatment. The objective circumstances would not lead a reasonable person to conclude that this statement would be used for prosecution. The nurse made the note to assist other medical personnel in the examination and treatment of M.Z., not in the hopes to aid prosecution. At the time of M.Z.'s treatment, the perpetrator's name was not known. Yates testified that she reviewed the triage notes prior to examining M.Z. to assist in the treatment. A

reasonable person in the triage nurse's position would not conclude that this initial note would be used against the defendant when the purpose of the note was to assist other medical personnel in the victim's treatment. Based on these circumstances, we find that the triage note prepared by the nurse was nontestimonial, and thus, no <u>Crawford</u> violation occurred.

Next, defendant argues that the trial court erred in admitting the expert testimony of Webert because it lacked a proper foundation and was the only physical evidence linking defendant to M.Z.'s apartment. The State asserts that defendant has forfeited this issue as he failed to objected at trial or specifically raised in his posttrial motion. Defendant concedes that the issue was not preserved, but asks this court to review it as plain error.

To preserve an issue for review, defendant must object both at trial and in a written posttrial motion. <u>People v. Enoch</u>, 122 Ill. 2d 176, 186 (1988). Failure to do so operates as a forfeiture as to that issue on appeal. <u>People v. Ward</u>, 154 Ill. 2d 272, 293 (1992). "This rule is particularly appropriate when a defendant argues that the State failed to lay the proper technical foundation for the admission of evidence, and a defendant's lack of a timely and specific objection deprives the State of the opportunity to correct any deficiency in the foundational proof at the trial level." <u>People v. Woods</u>, 214 Ill. 2d 455, 470 (2005); see also <u>People v. Bush</u>, 214 Ill. 2d 318, 332 (2005) (A defendant cannot contest the improper admission of evidence when "by acquiescing in rather than objecting to the admission of allegedly improper evidence, a defendant deprives the State of the opportunity to cure the alleged defect").

However, defendant asks this court to review this issue as plain error. Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be

noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a). The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." Piatkowski, 225 Ill. 2d at 565, citing Herron, 215 Ill. 2d at 186-87.

Defendant carries the burden of persuasion under both prongs of the plain error rule. People v. Lewis, 234 Ill. 2d 32, 43 (2009). Although defendant previously did not assert that the evidence was closely balanced when reviewing for plain error under the Rule 431(b) questioning, defendant now contends that the evidence was closely balanced and that Webert's testimony constituted plain error under both prongs. However, "[t]he first step of plain-error review is to determine whether any error occurred." Lewis, 234 Ill. 2d at 43. Therefore, we will review the issue to determine if there was any error before considering it under plain error.

Defendant extensively relies on the decision in People v. Safford, 392 Ill. App. 3d 212 (2009), to support his contention of error. However, the factual circumstances are easily distinguishable from those present in Safford.

In that case, the defendant was charged with aggravated battery with a firearm and attempted murder of a police officer. While on patrol, an officer observed a man he knew was wanted a robbery charge with another man. The officer detained both men and asked for identification. The second man did not have identification. As the officer called for backup from a device on his lapel, the second man pulled out a gun and shot the officer twice. The officer

31

survived the shooting and identified the defendant as the shooter from a photo array. The photo array was conducted while the officer was still in the hospital and on morphine. A lineup was never conducted. The officer's initial description of the shooter differed in height and weight from the defendant, as the officer originally described the shooter as shorter than the officer, but the defendant was taller. Another eyewitness identified the defendant as the shooter from a photo array conducted more than four years after the offense. Safford, 392 Ill. App. 3d at 215-16.

Prior to the testimony of the fingerprint expert, the defendant's attorney objected because "the fingerprint reports received in discovery did not list any points of comparison from which the expert could have drawn his conclusion of a match." Safford, 392 Ill. App. 3d at 216. The trial court noted the objection, but allowed the expert to testify. The fingerprint expert testified that a latent fingerprint was recovered from the patrol car where the second man had been standing. The expert stated that he matched the print from the car to the inked standard of the defendant. The expert admitted that he did not record any notes on points of comparison or how he reached his conclusion. He noted only that the latent print matched a known print.

The defendant presented multiple uninterested alibi witnesses and each testified that defendant was present at a seminar and open house presented by a realty company at the time of the shooting. Safford, 392 Ill. App. 3d at 217-18.

On appeal, the Safford court found that the trial court erred in allowing the fingerprint expert to testify about his conclusion that the latent print recovered from the patrol car matched the defendant without disclosing any matching points of comparison. Safford, 392 Ill. App. 3d at 219. The reviewing court held that "the trial court's decision to allow the fingerprint expert to testify where the expert did not provide an evidentiary foundation for his testimony

impermissibly curtailed the defendant's right to challenge that testimony in cross-examination, which negatively impacted the defendant's right to a fair trial under the facts of this case." Safford, 392 Ill. App. 3d at 219. The court's concern was "whether admitting expert testimony without a showing of the requisite foundation so curtails the ability of the defendant to challenge the conclusion drawn by the expert that it leads to a suggestion of infallibility." Safford, 392 Ill. App. 3d at 223. The Safford court noted that the defendant was left without a meaningful opportunity to cross-examine the expert.

> "In this case, the defendant was deprived of any means to challenge the 'conclusion' testimony of [the expert] that the latent print recovered at the spot where the shooter would have placed his hands on [the officer's] vehicle matched the standard taken from the defendant. It may well be that [the expert] was correct in his judgment; the record does not tell us. We agree with the defendant that [the expert's] testimony amounted to no more than 'take my word for it,' where no opportunity to challenge that testimony is provided." Safford, 392 Ill. App. 3d at 224.

In response to the State's assertion that any error in the fingerprint admission was harmless, the reviewing court detailed the closeness of the evidence presented. The State's identification witnesses never viewed a lineup, the officer was on morphine when he identified the defendant and the other eyewitness made her identification more than four years after the shooting. The defendant's alibi witnesses were unbiased and two came forward after hearing about the case on the radio. The court significantly noted that without the fingerprint evidence,

33

the defendant's alibi witnesses would be unchallenged by scientific evidence and the case would turn on the credibility of the witnesses. Safford, 392 Ill. App. 3d at 228-30. The court concluded that under the facts present in that case, the admission of the fingerprint expert's testimony was reversible error. Safford, 392 Ill. App. 3d at 230-31.

In contrast, this case presents a completely different factual situation. Significantly, defendant did not raise an objection at any time about the lack of foundation to Webert's testimony. Though Webert's testimony was substantially similar to that of the expert in Safford, in that she did not testify about any points of comparison and also did not keep notes of her conclusions, no objection was raised to challenge this as lacking foundation. Thus, our review is limited to whether this was plain error.

Defendant contends that the evidence in this case is closely balanced such that any error would be prejudicial. We disagree. The evidence was not closely balanced. M.Z. testified that defendant put a knife to her throat as she was leaving her apartment and forced her back inside her apartment. She stated that defendant went through her purse and the apartment looking for valuables and money. She told defendant about a container of change and he told her to sort out the quarters. M.Z. further testified that defendant unhooked her bra and started to remove her clothing. He told her to go into the bedroom and he then placed his penis in her vagina for about a minute. When she informed him that she did not have any condoms, he forced her to touch herself by placing her finger into her vagina while he watched. Defendant then ordered M.Z. into the living room and had her lie on him while he touched her. After a while, defendant ordered M.Z. to leave her apartment with him and ride the el train into Chicago.

M.Z. stated that defendant took her to City Sports at Wilson and Broadway. David Kim's

34

testimony corroborated her testimony and video surveillance showed defendant and M.Z. in the store at the counter and later at an ATM. Defendant forced M.Z. to make multiple bank withdrawals for several hundred dollars. M.Z.'s bank statements confirmed the withdrawal amounts and times. Defendant bought items at City Sports and made M.Z. get on the southbound Red Line with him.

M.Z. reported the attack to the Evanston police department that day and spoke with a detective and went to the hospital for treatment. Days later, she identified defendant in a photo array and later in a lineup. After he was arrested, defendant waived his Miranda rights and gave a statement to the police. He admitted to attacking M.Z. with a knife and forcing her into her apartment. He admitted to looking for her valuables. He admitted to making her touch herself and that he touched her. He also admitted that he forced M.Z. to go into Chicago with him, go to City Sports to purchase items and make multiple ATM withdrawals. Defendant did not present any alibi to dispute his participation in the crimes. Given the strength of the State's case, we conclude that the evidence was not closely balanced. Accordingly, defendant's claim of plain error under the first prong fails.

As to the second prong, defendant contends that the admission of the fingerprint evidence was so serious as to have affected the fairness of his trial because he was unable to challenge Webert's testimony. The State responds that any error was rendered meaningless as M.Z.'s testimony and notably, defendant's confession to Detective Nieman placed him in the apartment. We agree. Any error in this case was harmless as defendant admitted to being inside M.Z.'s apartment. The admission of the fingerprint evidence did not impact the fairness of defendant's trial and we reject defendant's claim of plain error.

35

Next, defendant contends that this court should reverse one of his convictions for aggravated criminal sexual assault because the trial court erroneously instructed the jury that "contact, however slight" between M.Z.'s finger and her vagina constituted an act of "sexual penetration" rather than "intrusion, however slight." Specifically, defendant argues that his conviction under count 4 of the indictment, aggravated criminal sexual assault involving the forced intrusion of M.Z.'s finger into M.Z.'s vagina by the use of force or by the threat of force, must be reversed and remanded for a new trial because the trial court incorrectly instructed the jury. The State responds that defendant has forfeited this issue as defendant failed to object to the proposed instruction during the jury instruction conference or object when the trial court gave the instruction to the jury nor did defendant raise this issue in a posttrial motion.

"Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion." Herron, 215 Ill. 2d at 175. "This principle encourages a defendant to raise issues before the trial court, thereby allowing the court to correct its errors before the instructions are given, and consequently precluding a defendant from obtaining a reversal through inaction." Piatkowski, 225 Ill. 2d at 564, citing Herron, 215 Ill. 2d at 175. Supreme Court Rule 451(c) "provides that 'substantial defects' in criminal jury instructions 'are not waived by failure to make timely objections thereto if the interests of justice require.'" Herron, 215 Ill. 2d at 175, quoting 177 Ill. 2d R. 451(c). "Rule 451(c) crafts a limited exception to the general rule to correct 'grave errors' and errors in cases 'so factually close that fundamental fairness requires that the jury be properly instructed.'" Herron, 215 Ill. 2d at 175, quoting People v. Hopp, 209 Ill. 2d 1, 7 (2004). "Rule 451(c) is coextensive with the 'plain

36

1-08-2264

error' clause of Supreme Court Rule 615(a), and we construe these rules 'identically.' " Herron, 215 Ill. 2d at 175, quoting People v. Armstrong, 183 Ill. 2d 130, 151 n.3 (1998); see also Piatkowski, 225 Ill. 2d at 564-65.

Thus, we again review this issue under the same two-pronged plain error analysis as previously discussed. Defendant asserts that the error in jury instructions satisfies both prongs of the plain error doctrine. Since we have already concluded that the evidence was not closely balanced in this case, our review is limited to whether the improper jury instruction affected the fundamental fairness of defendant's trial. Thus, "the question is whether a 'grave error' has been committed or, stated another way, whether an error of such gravity or magnitude has occurred that the fundamental fairness of defendant's trial has been severely threatened." People v. Durr, 215 Ill. 2d 283, 298 (2005).

During the jury instruction conference, the trial court indicated that it would give a non-pattern instruction and asked if there was any objection. Defense counsel did not object. During jury instructions, the trial court gave the IPI definition of "sexual penetration."

> "The term 'sexual penetration' means any contact, however slight, between the sex organ of one person and the sex organ of another person." Illinois Pattern Jury Instruction, Criminal, No. 11.65E (4th ed. 2000).

The court then added the following non-IPI instruction, without objection.

> "The term 'sexual penetration' also means any contact, however slight, between the sex organ of one person and an object. The term 'object' as it is used in sexual penetration can include a

37

victim's finger."

The State admits that the non-IPI instruction is not a correct statement of law. The supreme court has held that "the word 'object' in the 'contact' clause of the statutory definition of sexual penetration was not intended to include parts of the body." People v. Maggette, 195 Ill. 2d 336, 350 (2001). Rather, "sexual penetration" involving parts of the body means "any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person." 720 ILCS 5/12-12(f) (West 2004).

The State contends that any error by the trial court is not plain error, but instead amounts only to harmless error. "Though plain-error analysis normally requires the same kind of inquiry as does harmless-error review, there is an 'important difference' between the two." People v. Thurow, 203 Ill. 2d 352, 363 (2003), quoting United States v. Olano, 507 U.S. 725, 734, 123 L. Ed. 2d 508, 520, 113 S. Ct. 1770, 1778 (1993). In considering harmless error, the defendant would have made a timely objection and preserved the error and, thus, it is the State that carries the burden of proving beyond a reasonable doubt that the jury verdict would have been the same absent the error. Thurow, 203 Ill. 2d at 363. Additionally, a reviewing court "may invoke the harmless error doctrine to dispose of claims of error that have a *de minimus* impact on the outcome of the case." People v. Blue, 189 Ill. 2d 99, 138 (2000). In contrast, a plain error analysis arises when the defendant has failed to object to the error and now carries the burden of persuasion. Thurow, 203 Ill. 2d at 363. " 'In most cases, a court of appeals cannot correct the forfeited error unless the defendant shows that the error was prejudicial.' " Thurow, 203 Ill. 2d at 363, quoting Olano, 507 U.S. at 734, 123 L. Ed. 2d at 520, 113 S. Ct. at 1778.

"The function of jury instructions is to convey to the jury the law that applies to the

evidence presented." Herron, 215 Ill. 2d at 187. "Jury instructions should not be misleading or confusing [citation], but their correctness depends upon not whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them [citation]." Herron, 215 Ill. 2d at 187-88. We recognize that the supreme court has held that "a jury instruction error rises to the level of plain error only when it 'creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial.' " Herron, 215 Ill. 2d at 193, quoting People v. Hopp, 209 Ill. 2d 1, 8 (2004).

Defendant relies on the Fourth District's decision in People v. James, 331 Ill. App. 3d 1064 (2002), as support. In that case, the trial court improperly instructed the jury that " '[t]he term "sexual penetration" means any contact, however slight, between the sex organ or anus of one person and an object or finger.' " (Emphasis omitted.) James, 331 Ill. App. 3d at 1068. The reviewing court found the evidence in the case was closely balanced and concluded the improper instruction amounted to plain error because "[t]he instructions were enough to improperly tip the balance of evidence toward conviction of defendant." James, 331 Ill. App. 3d at 1068.

However, in the present case, we have already concluded that the evidence was not closely balanced. The question before us is whether the error in the jury instruction was so fundamental as to have threatened the fairness of defendant's trial. The supreme court has held that neither the omission of the definition of a term used to instruct the jury on the essential issue in the case nor an incorrect instruction on an element of the offense is necessarily reversible error. Hopp, 209 Ill. 2d at 10. The jury was properly informed at the start of the trial by the indictment that defendant was charged with an act of sexual penetration in that he "forced the

39

intrusion of [M.Z.'s] finger into [M.Z.'s] vagina by the use of force or by the threat of force." The evidence showed that M.Z. testified that defendant forced her to insert her finger into her vagina. Defendant also admitted to making M.Z. touch herself. The result of the trial would not have been different if the proper instruction had been given. Therefore, we decline to find plain error in the jury instruction because it was not so fundamental as to have severely threatened the fairness of defendant's trial.

In light of the dissent, we point out that defendant does not challenge the sufficiency of the evidence or allege that the indictment was defective in any way on the count of aggravated criminal sexual assault involving the insertion of M.Z.'s finger into her vagina. The Illinois Supreme Court recently reaffirmed that " 'a reviewing court should not normally search the record for unargued and unbriefed reasons to *reverse* a trial court judgment.' " (Emphasis in original.) People v. Givens, 237 Ill. 2d 311, 323 (2010), quoting Saldana v. Wirtz Cartage Co., 74 Ill. 2d 379, 386 (1978). The Givens court reinforced this principle, citing the United States Supreme Court.

> " 'In our adversary system, in both civil and criminal cases,
> in the first instance and on appeal, we follow the principle of party
> presentation. That is, we rely on the parties to frame the issues for
> decision and assign to courts the role of neutral arbiter of matters
> the parties present. To the extent courts have approved departures
> from the party presentation principle in criminal cases, the
> justification has usually been to protect a *pro se* litigant's rights.
> [Citation.] But as a general rule, '[o]ur adversary system is

designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.' [Citation.] As cogently explained:

"[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties. Counsel almost always know a great deal more about their cases than we do ***." [Citation.]' " Givens, 237 Ill. 2d at 324, quoting Greenlaw v. United States, 554 U.S. 237, ___, 171 L. Ed. 2d 399, 408, 128 S. Ct. 2559, 2564 (2008).

Whether the indictment was defective is not properly before us. Although the dissent suggests this error is obvious and based upon clear case precedent, we are unaware of any Illinois case having considered the novel issue raised *sua sponte* by the dissent. In accordance with the supreme court's mandate, we decline to consider unargued and unbriefed issues as a reason to reverse the jury's verdicts in this case.

Defendant's only argument regarding the non-IPI jury instruction is that the trial court incorrectly used the word "contact" instead of "intrusion" when the charge involved a part of the body. We do not agree that this was a fundamental error so as to have infected the fairness of defendant's trial. The jury heard M.Z.'s testimony that defendant, while armed with a knife, forced her to put her finger inside her vagina. Defendant admitted that he made M.Z. touch

herself while he possessed a knife. Given the evidence in this case and the rest of the jury instructions, we do not find that this instruction error severely threatened the fairness of defendant's trial as to satisfy the second prong of plain error.

Defendant next argues that the State failed to prove him guilty of home invasion because the evidence presented did not establish that people were present in the apartment when it was entered. When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. People v. Hall, 194 Ill. 2d 305, 329-30 (2000). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); accord People v. Cox, 195 Ill. 2d 378, 387 (2001). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789. Since defendant does not challenge the credibility of witnesses, but instead questions whether the uncontested facts were sufficient to prove the elements of home invasion, our review is *de novo*. In re Ryan B., 212 Ill. 2d 226, 231 (2004).

Section 12-11(a)(1) of the Criminal Code of 1961 provides:

"(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or

he or she knowingly enters the dwelling place of another and

remains in such dwelling place until he or she knows or has reason

to know that one or more persons is present and

(1) While armed with a dangerous weapon, other

than a firearm, uses force or threatens the imminent use of

force upon any person or persons within such dwelling

place whether or not injury occurs[.]"  720 ILCS 5/12-

11(a)(1) (West 2004).

Defendant asserts that M.Z. was outside her apartment when she was seized by defendant and no one was in the apartment when he entered.  However, this court has already considered and rejected the argument advanced by defendant.  In People v. Thomas, 384 Ill. App. 3d 895 (2008), the defendant raised the same argument—the evidence did not establish that people were present when the defendant entered the home as the victims had been seized outside their home.  The defendant in Thomas, like defendant here, relied on the supreme court's decision in People v. Pettit, 101 Ill. 2d 309 (1984), as support.  Thomas, 384 Ill. App. 3d at 899.

"In Pettit, the defendants were engaged in a drug deal when

they drew guns and demanded the address of the seller's supplier.

The defendants forced the seller and another drug seller to go with

them to the residence.  Once there, they forced their way into the

first-floor apartment of the supplier, who was not at home.  An

upstairs neighbor was there to babysit the supplier's son.  The

babysitter screamed and her boyfriend came downstairs from their

43

unit. After a few hours, one of the defendants went upstairs to see if anyone was in the second-floor apartment. After finding it deserted, he ordered everyone upstairs into that apartment. While in that apartment, some fighting occurred and one of the victims was injured. The defendants were charged in the information for the home invasion of the second-floor apartment only. Pettit, 101 Ill.2d at 310-12. The supreme court held that '[t]he statute specifically requires the presence of one or more persons to constitute a violation' and that at the time of the invasion of the second-floor apartment, 'the dwelling was deserted.' Pettit, 101 Ill.2d at 313. However, the supreme court also concluded that the evidence failed to show that the defendants knowingly invaded the second-floor apartment where the evidence presented showed that the defendants did not know the house was divided into two apartments. Pettit, 101 Ill.2d at 314." Thomas, 384 Ill. App. 3d at 899.

We concluded that the defendant's argument failed for two reasons. First, one of the victims testified that he was inside the house at the time of entry. Thomas, 384 Ill. App. 3d at 899. Second, even if that testimony was insufficient to establish presence in the house, the Fourth District in People v. Dall, 207 Ill. App. 3d 508 (1991), had previously held that simultaneous entry with the victim is sufficient to satisfy the home invasion statute. Thomas, 384 Ill. App. 3d at 900. In Dall, the victim was attacked in a similar manner as M.Z., she was

44

unlocking the door when she was seized from behind and forced into the house. Dall, 207 Ill. App. 3d at 514. The Dall court also distinguished the decision in Pettit.

> "Pettit's conviction for home invasion was reversed on appeal. Pettit and two others had invaded the first floor of a house which had been divided into two apartments. The residents of the upstairs apartment were baby-sitting for the downstairs residents. All of the evidence indicated Pettit and the other defendants were unaware of the fact that the house had been divided into two apartments. After waiting for the first-floor apartment dwellers to return, Pettit took his hostages upstairs. He was charged with home invasion of the second-floor apartment. The supreme court affirmed reversal of the convictions, noting that no evidence indicated Pettit knew he was entering the 'dwelling of another' when he went upstairs." Dall, 207 Ill. App. 3d at 523.

"The [Dall] court then found that '[f]orcing a person into her own home and following that person into the home without authority satisfies the portion of the home invasion statute, that defendant, without authority, enters the dwelling place of another knowing that one or more persons are present.' " Thomas, 384 Ill. App. 3d at 900, quoting Dall, 207 Ill. App. 3d at 523-24. We held that even if the victim had not entered the house before one of the offenders, "the simultaneous forced entry alongside the victim is sufficient to satisfy the home invasion statute." Thomas, 384 Ill. App. 3d at 900.

We continue to follow the holding in Thomas. Here, M.Z. testified that she was locking

her apartment door when defendant put a knife to her throat and forced her into her apartment. Her testimony was that she entered the apartment in front of defendant. Thus, she technically entered the apartment before defendant. Regardless, under Thomas and Dall, we find that the evidence was sufficient to establish home invasion when defendant forcibly entered the apartment simultaneously with M.Z.

Finally, defendant contends that the trial court erroneously imposed an unidentified $30 assessment and failed to award him statutory credit against his fines which would have satisfied the $200 sexual assault fine. The State concedes that defendant should have been granted the $5-per-day credit to be applies against the sexual assault fine and the mittimus should be amended to reflect that credit.

Defendant next asserts that a $30 assessment was entered without citing any statutory authority and, therefore, it is void. The assessment was listed under the "Miscellaneous" section of the monetary judgment order under the "Other as Ordered by the Court" line with a notation of "CAC." Alternatively, defendant argues that the $30 assessment is a fine, which would be satisfied by his presentence credit. The State maintains that the $30 assessment was properly imposed under the Children's Advocacy Center (CAC) "fine" (55 ILCS 5/5-1101(f-5) (West 2008)). The State further responds that the CAC "fine" should be considered a "fee" and defendant is not entitled to credit on this assessment.

"The propriety of a trial court's imposition of fines and fees raises a question of statutory interpretation, which we review *de novo*." People v. Price, 375 Ill. App. 3d 684, 697 (2007).

Section 5-1101(f-5) provides:

"In each county in which a Children's Advocacy Center

46

provides services, the county board may adopt a mandatory fee of between $5 and $30 to be paid by the defendant on a judgment of guilty or a grant of supervision under Section 5-9-1 of the Unified Code of Corrections for a felony; for a Class A, Class B, or Class C misdemeanor; for a petty offense; and for a business offense. Assessments shall be collected by the clerk of the circuit court and must be deposited into an account specifically for the operation and administration of the Children's Advocacy Center. The clerk of the circuit court shall collect the fees as provided in this subsection, and must remit the fees to the Children's Advocacy Center." 55 ILCS 5/5-1101 (f-5) (West 2008).

Under this statute, the trial court was required to assess a mandatory "fee" for up to $30 from defendant because he was found guilty of a felony offense. Although the trial court's order did not reference the statutory citation, the notation of "CAC" and the assessment of $30 indicates to us the trial court's intent to assess defendant the charge under this statute. Thus, the trial court had the statutory authority to assess the $30 charge. However, we must still determine whether the CAC "fee" is actually a "fee" or a "fine."

Recently, this court in People v. Jones, 397 Ill. App. 3d 651 (2009), considered this question. In that case, the reviewing court was asked to determine if the CAC "fee" was a "fine" so as to preclude the imposition of the $20 Violent Crime Victims Assistance Fund fine. Jones, 397 Ill. App. 3d at 659. The court concluded that the CAC charge, though labeled a "fee," was a "fine."

47

"Although the statute terms this charge a 'fee' (55 ILCS 5/5-1101(f-5) (West 2008)), we find that the charge is a fine under the reasoning of our supreme court's recent decision in People v. Graves, 235 Ill. 2d 244 (2009). As the supreme court explained in Graves, a fee that ' "seeks to recoup expenses incurred by the state," ' while a fine is ' " 'punitive in nature' " ' and is also ' " 'a pecuniary punishment imposed as part of a sentence on a person convicted of a criminal offense.' " [Citation.] ' Graves, 235 Ill. 2d at 250, quoting People v. Jones, 223 Ill. 2d 569, 581, 582 (2006). Even if the statute terms a charge a fee rather than a fine, that label is not determinative. Jones, 223 Ill. 2d at 599. *** Although the statute terms the charge a fee, rather than a fine, the fact that the charge is mandatory for convicted defendants, and does not reimburse the state for expenses incurred while prosecuting the defendant, indicates that the Children's Advocacy Center charge is a fine rather than a fee. Jones, 223 Ill. 2d at 600 (a charge is a fine, despite its label, if it 'does not seek to compensate the state for any costs incurred as the result of prosecuting the defendant').

In addition, the appellate court recently held in [Price], that a fee is more appropriately characterized as a fine where there was 'no relevant connection' between the offense committed by the defendant and the public endeavor funded by the fee. Price, 375

48

Ill. App. 3d at 700. In the instant case, there was no relevant connection between defendant's theft of scrap metal pipes and children's advocacy or juvenile justice. This lack of relevant connection between the defendant's offense and the fee charged also indicates that the Children's Advocacy Center charge is a fine rather than a fee." Jones, 397 Ill. App. 3d at 660-61.

We agree with the Jones court's holding that the CAC charge is a "fine" rather than a "fee" as it does not relate to court costs from prosecution and is a mandatory charge. Despite the court's conclusion in Jones that the CAC charge is a fine, the State contends that we should find the charge to be a "fee" because defendant's conviction has a connection with the CAC as it assists victims of sexual assault. The State's argument is not well taken as it adds language to the statute and would allow the CAC charge to be a "fee" and a "fine" depending on the defendant's offense. The statute does not provide for the CAC charge to be assessed for different reasons based a defendant's conviction. Rather, it is a mandatory charge for a defendant found guilty of a felony or other listed offenses. The statute does not require a connection to the work of the CAC for the assessment to be made. Further, defendant's convictions did not involve a minor and are not connected to "children's advocacy or juvenile justice." Accordingly, we find that the CAC charge is a fine. Thus, under section 110-14(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-14(a) (West 2008)), defendant is entitled to additional presentence credit in the amount of the $30.

Under Supreme Court Rule 615(b)(1), this court has the authority to order a correction of the mittimus. 134 Ill. 2d R. 615(b)(1). We order that the mittimus be corrected to reflect a credit

49

of $230 toward the imposed fines, reducing defendant's monetary judgment from $1,035 to $805.

In a petition for rehearing and based solely upon an issue raised *sua sponte* by the dissent, defendant raises two new previously unbriefed issues. Defendant argues for the first time a sufficiency of the evidence claim and a claim that his appellate counsel was ineffective for failing to challenge the sufficiency the evidence on count iv, aggravated criminal sexual assault. Defendant cannot raise new issues in a petition for rehearing. See 210 Ill. 2d R. 341(h)(7) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"); Anderson v. First American Group of Companies, Inc., 353 Ill. App. 3d 403, 415 (2004).

Although a reviewing court has the power to raise unbriefed issues under Supreme Court Rule 366(a)(5), it must refrain from doing so when it would transform the appellate court's role from that of jurist to that of advocate. Givens, 237 Ill. 2d at 324, citing People v. Rodriguez, 336 Ill. App. 3d 1, 14 (2002). " 'Were we to address these unbriefed issues, we would be forced to speculate as to the arguments that the parties might have presented had these issues been properly raised before this court. To engage in such speculation would only cause further injustice; thus we refrain from addressing these issues *sua sponte.*' " Givens, 237 Ill. 2d at 324, quoting Rodriguez, 336 Ill. App. 3d at 14. Moreover, as the supreme court pointed out in Givens, review of an unbriefed issue should only take place in the rare instance where the error is clear and obvious and based upon well-established precedent. Givens, 237 Ill. 2d at 326. This is not such a case because the alleged error here is not clear and obvious and not based upon well-established precedent.

1-08-2264

One of these new issues is whether defendant committed aggravated criminal sexual assault when he forced the victim to place her own finger into her vagina. Although <u>Maggette</u> held that a finger cannot be an object for purposes of criminal sexual assault, the question raised by the dissent and now defendant is whether penetration occurs when a victim is forced to intrude into her own sexual organ by the defendant's acts. This issue was not addressed by <u>Maggette</u>. In addition, instead of looking at two new issues, we are faced with numerous questions raised in a petition for rehearing because of the dissent. For example, did the legislature intend to criminalize the intrusion or penetration of the defendant's finger into the victim's vagina, but not intend for the defendant's forced intrusion of the victim's finger into her own vagina to be aggravated criminal sexual assault? When the victim's finger is used to intrude upon her own sexual organ, do these acts amount to aggravated criminal sexual abuse? Did the original indictment charge the lesser-included offense of aggravated criminal sexual abuse? Is this claim also a challenge to a defective indictment? All of these questions are a direct result of an issue raised in the dissent. And yet to address any of them would force us to speculate as to the arguments that the parties might have presented had these issues been properly raised before this court.

Despite defendant's suggestions to the contrary, judicial economy is not served where issues raised *sua sponte* by a dissenting justice create multiple new claims in a petition for rehearing. As pointed out above, we would be addressing multiple new issues which were never briefed or argued to this court. This is not the appropriate way to resolve issues that are not clear and obvious errors. See <u>Givens</u>, 237 Ill. 2d at 324 (vacating an appellate decision for considering *sua sponte* an error that was not "obvious").

51

1-08-2264

We conclude the Post-Conviction Hearing Act (725 ILCS 5/122-1 through 122-8 (West 2004)) or a petition pursuant to section 2-1401 of the Code of Civil Procedure for relief from judgment (735 ILCS 5/2-1401 (West 2004)) would be an appropriate forum to raise these issues where both parties would have the opportunity to brief the issues and the trial court would be afforded the chance to consider the claims.

For the foregoing reasons, we affirm defendant's conviction and the mittimus is corrected as ordered.

Affirmed; mittimus corrected.

GARCIA, P.J., concurs.

JUSTICE ROBERT E. GORDON, dissenting in part:

I must respectfully dissent in part, because I believe that we should grant defendant's request on this appeal to reverse his conviction on count IV of the indictment.

Count IV charged defendant with aggravated criminal sexual assault:

> "In that he committed an act of sexual penetration upon [the victim], to wit: Anthony McNeal forced the intrusion of [the victim's] finger into [the victim's] vagina by the use of force or threat of force and Anthony McNeal displayed, threatened to use, or used a dangerous weapon, other than a firearm, or any object fashioned or utilized in such a manner as to lead the victim under the circumstances to believe it to be a dangerous weapon, to wit: Anthony McNeal displayed a knife, in violation of chapter 720, act 5, section 12-14(A)(1)."

52

Aggravated criminal sexual assault occurs when a defendant "commits criminal sexual assault" and there also exists one of the listed aggravating circumstances, such as the display or threat to use a knife. 720 ILCS 5/12-14(a)(1) (West 2004). Criminal sexual assault requires "an act of sexual penetration." 720 ILCS 5/12-13(a) (West 2004).

Sexual penetration is defined by statute, as follows:

" 'Sexual penetration' means [1] any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or [2] any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person ***." 720 ILCS 5/12-12 (f) (West 2004).

The statute provides two means for penetration to occur: (1) by "contact"; or (2) by "intrusion." Neither provision applies to the conduct described in count IV of the indictment. First, the "contact" provision does not apply to the conduct described in count IV, because a finger is certainly not a "sex organ, mouth or anus," and a finger is also not "an object." 720 ILCS 5/12-12(f) (West 2004). Our supreme court has held that "the word 'object' in the 'contact' clause of the statutory definition of sexual penetration was not intended to include parts of the body." Maggette, 195 Ill. 2d at 350. Thus, the "contact" provision does not apply to the conduct described in count IV.

Second, the "intrusion"provision does not apply either. The statute is very clear that, in order for sexual penetration to occur by the "intrusion" of a finger, it must be the finger of "one person" into the sex organ or anus of "another person." (Emphasis added.) 720 ILCS 5/12-12(f)

1-08-2264

(West 2004). Thus, the "intrusion" provision does not apply either.

Since neither the "contact" nor the "intrusion" provision applies, the conduct described in count IV cannot be sexual penetration. Thus, even if the State proved beyond a reasonable doubt the conduct charged in count IV, it would not prove aggravated criminal sexual assault. Simply put, the described conduct does not constitute the charged offense.

Defendant has not raised this issue, either in the trial court or on this appeal. In his appellate brief, he states specifically that "[n]o issue is raised challenging the charging instrument."

On appeal, defendant does challenge the jury instruction on sexual penetration, but with a slightly different argument. In his appellate brief, defendant claims that "the definition used by the trial court – i.e. that 'any contact' between a body part and a sex organ constitutes 'sexual penetration' for the purposes of proving sexual assault was invalid." Defendant argues that "where the alleged penetration of a sex organ is made with a body part, the State is required to prove an 'intrusion' by that body part, not merely contact." In its appellate brief, the State admits that the instruction was "incorrect," but argues that the error does not rise to the level of plain error.

In essence, defendant is arguing on appeal that the State was required to prove that the victim's finger intruded into her vagina, instead of simply making contact with her vagina. Defendant is not arguing that even an intrusion was not penetration as defined by the statute.

Thus, the question for us on appeal is whether we should affirm a conviction for conduct that does not constitute the charged offense when defendant's counsel has not raised the issue.

In People v. Givens, 237 Ill. 2d 311 (2010), our supreme court held that "a reviewing

54

court does not lack authority to address unbriefed issues and may do so in the appropriate case, i.e., when a clear and obvious error exists in the trial court proceedings." Givens, 237 Ill. 2d at 325. Our supreme court observed that it had previously held that "under Supreme Court Rules 341(e)(7) and 366(a)(5), a reviewing court may sometimes raise and consider unbriefed issues in order to provide 'for a just result and for the maintenance of a sound and uniform body of precedent.' " Givens, 237 Ill. 2d at 325, quoting Hux v. Raben, 38 Ill. 2d 223, 225 (1967). Supreme Court Rule 366 provides that "[i]n all appeals the reviewing court may, in its discretion, and on such terms as it deems just, *** (5) enter any judgment and make any order that ought to have been given or made." 155 Ill. 2d. R. 366(a)(5).

In Givens, our supreme court provided an example of where it was appropriate for an appellate court to raise an unbriefed issue, sua sponte. The Givens court stated that the appellate court in People v. Rodriguez, 336 Ill. App. 3d 1 (2002), had appropriately exercised its discretion to review an unbriefed issue. In Givens, our supreme court observed that the appellate court in Rodriguez was "compelled in the interest of justice to sua sponte address the trial court's 'obvious error' in convicting defendant of four separate counts of first degree murder involving a single murder." Givens, 237 Ill. 2d at 328, quoting Rodriguez, 336 Ill. App. 3d at 12.

By contrast, our supreme court found that the facts before it in Givens did not warrant sua sponte review because there may have been no error at all and, even if there was an error, it certainly was not an obvious one. Givens, 237 Ill. 2d at 326-27. In Givens, the appellate court had held sua sponte that the trial counsel was ineffective for failing to file a motion to suppress on the ground that the person consenting to a search lacked the authority to consent. Givens, 237 Ill. 2d at 315-16.

55

Our supreme court found that the appellate court misapplied precedent in holding that there was any error, much less an obvious one. Givens, 237 Ill. 2d at 326-27. Our supreme court observed that "[t]he appellate court managed to quote the key language from [prior cases], despite the fact that its applicability to the present case seems to have been lost on the appellate court." Givens, 237 Ill. 2d at 327. Our supreme court further observed that "the State filed a petition for rehearing that raised points and cited authority that legitimately called into question the correctness of the appellate court's holding." Givens, 237 Ill. 2d at 327. The appellate court denied the State's petition "without any modification and without addressing the points raised." Givens, 237 Ill. 2d at 328.

Our facts are closer to the facts in Rodriguez than to the facts in Givens. As in Rodriguez, defendant was found guilty on a count that was not warranted by the charged offense. As in Rodriguez, our reasoning is based on clear precedent, namely, our supreme court's holding in Maggette. See Maggette, 195 Ill. 2d at 350. Thus, I would find, based on Givens and Rodriguez, that there was an obvious error based on clear precedent that warrants our review. I would review this issue and reverse on this ground.

However, there exists another, wholly independent ground for reversing the conviction on count IV. As an additional ground, I would find that the instructional error, which was argued by defendant on appeal and conceded as error by the State, rose to the level of plain error and that this plain error constitutes a separate and independent ground for reversal.

The evidence was closely balanced on the issue of whether the victim's finger intruded into her vagina. The victim, who was not a native English speaker, testified that she "had to put finger into my own vagina." By contrast, defendant provided a very detailed statement to the

56

police which described the conduct slightly differently. In his first statement, he stated ambiguously that he told the victim to "touch herself," and that she did. However, in his second statement, he stated more specifically that he instructed her "to touch her clitoris," which obviously is not inside her vagina. Thus, the State's own evidence is conflicted on the issue of whether the victim's finger actually intruded into her own vagina. Due to this conflict in evidence, I would find that the evidence on this particular count, even as it is described in the indictment, was closely balanced.

The majority concluded that the evidence was not closely balanced, but did not specifically analyze whether the evidence was closely balanced for this particular count. As a result, it is not clear to me whether we really disagree on this point.

In light of the conceded error and the fact that the evidence was closely balanced on the very point of law about which the error concerned, I would reverse the conviction on count IV. I would then remand for proceedings consistent with the law discussed here.